# ROBERT NEWBORN *v.* STATE OF MARYLAND

[No. 249, September Term, 1975.]

*Decided November 28, 1975.*

86

The cause was argued before MOYLAN, POWERS and LOWE, JJ.

*William H. Murphy, Jr.,* for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City, Dana M. Levitz* and *Robert Lynott, Assistant State's Attorneys for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

In yet another variation of the arguable impact of *Mullaney v. Wilbur,* 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975), this case raises the question of the method by which a fair jury question is generated. The appellant, Robert Newborn, was convicted in the Criminal Court of Baltimore by a jury, presided over by Judge David Ross, of murder in the second degree. He does not question the legal sufficiency of the evidence to establish his guilt. He contends rather:

1) that an erroneous jury instruction, in the light of *Mullaney v. Wilbur,* was given, unconstitutionally imposing upon him the burden of showing such mitigation as would reduce the crime from murder to manslaughter;

2) that oral statements given by him, visual observations made of him and a physical examination of his hands were all unconstitutionally obtained fruits of the poisonous tree under *Wong Sun v. United States,* 371 U. S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963), and *Brown v. Illinois,* 421 U. S. 590, 95 S. Ct. 2254, 45 L.Ed.2d 416 (1975); and

3) that the trial judge erroneously refused to permit him to reopen his case for purposes of attempting to obtain the presence and testimony of an additional defense witness.

## The Mullaney v. Wilbur Problem

There is no question but that the jury instruction dealing with the presumption of malice and placing the burden upon the appellant to negate malice was academically incorrect in the light of *Mullaney v. Wilbur*, as analyzed and explained in terms of its effect upon Maryland law in *Evans v. State*, 28 Md. App. 640, 349 A. 2d 300 (1975). The initial instruction to the jury was, in pertinent part:

"Malice is the intentional doing of a wrongful act to another without legal excuse or justification. It includes any wrongful acts done wilfully and purposely. *In the absence of justification, excuse, or some circumstance of mitigation the law presumes all homicides, that is all killings of other human beings, to be committed with malice and to constitute murder in the second degree.*[1] The burden is on the State to prove the element of deliberation and premeditation, which would elevate the offense to murder in the second degree. And *the burden is on the Defendant to show some circumstance of mitigation, excuse, or justification which would reduce the offense to manslaughter or not guilty."* (Emphasis supplied)

Following a brief bench conference and just before the

---

1. This limited statement, standing alone, would be, as we analyzed in *Evans* in Part IIGc, constitutionally inoffensive. Since all of the elements of malice are given, there is nothing left to be presumed. As we there observed

"The obvious question is, 'Why presume malice when all of its elements are already given as established facts?' Since malice *is*, by definition, 'intentional killing absent justification, excuse or mitigation,' the above statement posing as a presumption is no presumption at all. From A, B and C, we may presume D; but from A, B and C, we do not *presume* A, B and C. The 'presumption' as thus expressed is the equivalent of saying, 'From the given establishment of all elements of malice we will presume malice.' or, alternatively, 'From an intentional killing, absent justification, excuse or mitigation, we will presume an intentional killing, absent justification, excuse or mitigation.'"

jury retired to deliberate, the following reinstruction was given:

"Members of the jury, counsel have suggested that I inadvertently misread or misstated a portion of the instructions. So that there will be no doubt or question about it, I will reread to you that portion. It is as follows: *In the absence of justification, excuse or some circumstance of mitigation, the law presumes all homicides to be committed with malice and to constitute murder in the second degree. The burden is on the State to prove the elements of deliberation and premeditation which would raise the homicide to murder in the first degree. The burden is on the Defendant to show circumstances of mitigation, excuse or justification which will reduce the offense to manslaughter or not guilty.*" (Emphasis supplied)

As we analyzed fully in Part IIG of *Evans*, such an instruction, purporting to place a burden upon the defendant to prove such justification or excuse as would relieve him of guilt or such mitigation as would lower his degree of guilt is unconstitutional under *Mullaney v. Wilbur.* Such an instruction, given in circumstances where it might have operational effect, would relieve the State of its responsibility of proving every element of a crime beyond a reasonable doubt, thereby offending the Due Process Clause as interpreted by *In re Winship*, 397 U. S. 358, 364, 90 S. Ct. 1068, 25 L.Ed.2d 368, 375 (1970), the predicate case on which *Mullaney v. Wilbur* rested.

As we further pointed out in *Evans* (Part IF and Part IIH), however, even an erroneous instruction is immaterial unless it deals with an issue fairly generated in the case. *Brown v. State*, 29 Md. App. 1, 349 A. 2d 359 (1975), and *Burko v. State*, 28 Md. App. 732, 343 A. 2d 251 (1975).

In the present case, the evidence revealed that Harriett Watkins, an elderly woman who had been the girlfriend of the appellant, was found dead at 7 a.m. on February 1, 1974,

by a city trash collector in the rear of 1818 W. Mulberry Street in Baltimore. Through a number of witnesses, whose testimony need not be here detailed, a legally sufficient web of guilt was woven about the appellant. Nothing in the State's case served to generate any legitimate question of justification, excuse or mitigation. The appellant took the stand and flatly denied his homicidal agency. None of the evidence, from either the State or the defense, served to generate a fair jury question on any of the issues of justification, excuse or mitigation.

In argument before us, appellant's counsel candidly acknowledges as much. He seeks, however, innovatively to establish that the issue at least of such mitigation as would lower the level of guilt to manslaughter was generated by the opening statement and closing argument of the Assistant State's Attorney. In opening statement, the Assistant State's Attorney told the jury about the presumption that unlawful killing is murder in the second degree in essentially the same terms as the judge did later in his jury instructions. The Assistant State's Attorney also **said to the jury, "The second issue for you to decide and** probably one that is going to cause you a little bit more problems, and I will tell you now, is what crime was committed?" In closing argument, the Assistant State's Attorney returned to the same theme, "The second issue is the one I said you are going to have a little bit more problems with. And that is, what was the crime that was committed?"

We simply cannot buy the appellant's argument that a gratuitous reference to manslaughter, unsupported by any evidence, made by the prosecutor has any more significance **than a gratuitous reference in that regard made by the** judge. Based upon our reading of both *Mullaney v. Wilbur* and the general state of the underlying law, both in Maryland and throughout the common law world, we indicated in *Evans* (Part IIH) that a fair jury question can **only be generated by *evidence* and not by pleadings,** courtroom allegations or arguments unsupported by evidence. We there said:

"We are persuaded that nothing in *Mullaney v. Wilbur* adversely affects in any way the status of presumptions in this limited function of *requiring that there be produced sufficient evidence* to generate a jury issue. The holding of *Mullaney v. Wilbur* was very careful to add a qualifying clause, at 44 L.Ed.2d 522:

'We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation *when the issue is properly presented in a homicide case.*' (Emphasis supplied)

*Mullaney v. Wilbur* went on very explicitly, at 44 L.Ed.2d 521, n. 28:

'Many States do require the defendant to show that there is "some evidence" indicating that he acted in the heat of passion before requiring the prosecution to negate this element by proving the absence of passion beyond a reasonable doubt. . . *Nothing in this opinion is intended to affect that requirement.*' (Emphasis supplied)

*Mullaney v. Wilbur* went on, at 522, n. 31, to explain that constitutionally proper presumptions simply shift to a defendant the burden of *producing evidence* (or of *relying,* at his risk, *upon the evidence produced by the State*) and not the burden of ultimate persuasion . . ." (Emphasis supplied)

In *Evans,* we quoted with approval from LaFave and Scott, *Criminal Law* (1972), at 47:

"As to the burden of production of *evidence, it is uniformly held that the defendant is obliged to start matters off by putting in some evidence in support of his defense — e.g., evidence of his insanity,* or of his acting in self-defense, or of one of

the other affirmative defenses — *unless* of course *the prosecution,* in presenting its own side of the case, *puts in some evidence* of a defense, in which case the matter of defense is properly an issue though the defendant himself produces nothing further to support it." (Emphasis supplied)

To generate a fair jury question on a number of issues, the law of Maryland has always required the production of *evidence. Bateman v. State,* 10 Md. App. 630, 272 A. 2d 64; *Mock v. State,* 2 Md. App. 771, 237 A. 2d 811 (requiring that *evidence* of intoxication be produced to generate a jury question in that regard); *Bremer v. State,* 18 Md. App. 291, 315-316, 307 A. 2d 503; *Dennis v. State,* 13 Md. App. 564, 569, 284 A. 2d 256; *Strawderman v. State,* 4 Md. App. 689, 698, 244 A. 2d 888 (requiring that *evidence* of insanity be produced to generate a jury question in that regard); *Street v. State,* 26 Md. App. 336, 338-341, 338 A. 2d 72 (requiring that *evidence* of self-defense be produced to generate a jury question in that regard); and *Fisher v. State,* 28 Md. App. 243, 345 A. 2d 110 (requiring that *evidence* of entrapment be produced to generate a jury question in that regard).

Throughout Part IF and Part IIH of *Evans,* the parts of that opinion here pertinent, we spoke consistently of the requirement that a legitimate jury issue be generated by *evidence* bearing on that issue. We there said, in Part IIH:

"A presumption in the Thayer-Wigmore tradition simply places upon a defendant the onus of *producing evidence, or of relying* at his risk *upon evidence produced by the State,* sufficient to generate a jury issue with respect to a particular defense. Once *the issue is generated by evidence,* the presumption totally dissipates (the bubble bursts) and the State assumes the burden of persuasion on that issue beyond a reasonable doubt. . . . *If the issue has not been generated by evidence,* the jury never receives the issue." (Emphasis supplied)

In the instant case, there was simply no evidence whatsoever generating a jury issue with respect to justification, excuse or mitigation. The jury instruction, therefore, although academically incorrect, was palpably harmless.

### The Brown v. Illinois Question

The appellant also exercises a constitutional imagination at the appellate level of which he did not avail himself at the trial level. He looks to an oral statement, to certain visual observations made of his body and to a blood test made on his hands — all of which occurred while he was in police custody at sometime shortly after 12:30 p.m. on February 1, 1974. He now claims, for the first time, that these were consequences of an unlawful arrest which occurred several hours earlier. He now claims, under *Wong Sun v. United States, supra,* that the oral statement, the observations and the blood test were fruits of the poisonous tree — exploitations of that primary illegality. He particularly seeks succor in *Brown v. Illinois, supra.*

We note initially that at his trial, the appellant made no objection to any of the three items now in question upon the theory that they were the unconstitutionally tainted products of an initially bad arrest. Maryland Rule 1085 is enough to foreclose further review.

We note, further, however, that in this case, unlike *Brown v. Illinois* and unlike *Ryon v. State,* 29 Md. App. 62, 349 A. 2d 393, in which Chief Judge Orth thoroughly analyzed the effect of *Brown v. Illinois,* no unlawful arrest was established. Although the indifference of the appellant effectively precluded a square ruling on the legality of the arrest, every indication from the record tends to support the conclusion that it was perfectly lawful. Detective Howard Corbin, a twelve-year veteran of the Homicide Squad, responded to the crime scene and examined the body of the victim at approximately 7:30 a.m. on the morning of February 1. He spoke to Glenda Black, the victim's daughter; to Lena Rita Finch, a neighbor who knew the

victim; and to James Edwards, another resident of the neighborhood where the crime occurred. He took all three of these witnesses with him to the Western District Police Station where he spent the remainder of the morning interrogating them and taking affidavits from them.

Although Detective Corbin did not testify as to the information he received from these witnesses at the in-trial suppression hearing on the oral statement (for the very good reason that the legality of the appellant's arrest was not being contested and that probable cause for that arrest was, therefore, not in issue), a brief summary of their testimony at the trial gives rise to a fair inference of what Detective Corbin learned during several hours of reducing to affidavit form the information of the witnesses. At the trial, no spectre was raised of any prior inconsistent statements.

Glenda Black, the victim's daughter, testified as to the boyfriend-girlfriend relationship between the appellant and the victim. She had seen her mother and the appellant together, drinking, the night before her mother's body was found. At 7:30 p.m. that evening, the appellant and the victim were observed "fussing" over the appellant's having taken the victim's pocketbook. That was the last occasion when Glenda Black saw her mother alive.

Mrs. Finch testified that the victim sometimes lived with her "as a friend of the family." She observed the appellant and the victim arguing with each other at approximately 8 p.m. on the evening when the crime occurred. She observed the appellant strike the victim in the face with his hand. She observed the appellant pull a knife and threaten to stab the victim in the heart if any neighbors interfered with the argument that he was then having with her.

James Edwards heard the appellant arguing with the victim at approximately 11 p.m. on the evening that the crime occurred. He observed that "they was drinking right much." He had seen them earlier that evening arguing about the victim's pocketbook. He heard one of the two parties to the quarrel say, "I'll kill you," and he offered the opinion that "it sounded mostly like Mr. Robert's voice."

Detective Corbin did indicate in his testimony that after leaving the crime scene, he went to the home of the appellant but did not find the appellant there. While Detective Corbin was in the process of reducing the statements of the three above-named witnesses to writing at the Western District Police Station, the appellant came there of his own volition at approximately 10:45 a.m. Although taking time to give the appellant his *Miranda* warnings, Detective Corbin then had him detained in another part of the building until Detective Corbin finished his interrogation of the witnesses. It was not until approximately 12:20 p.m. that Detective Corbin was able to turn his attention to the appellant.

The appellant had voluntarily presented himself at the Western District Police Station in order, ostensibly, to inquire as to the whereabouts of his girlfriend, the victim of the crime. To this inquiry, Detective Corbin responded by asking the appellant when he had last seen the victim alive. He responded that he had not seen her at any time after 7 p.m. on the night of January 31. The knowledge possessed by all three of the witnesses already referred to belied that statement.

However much probable cause may have accumulated in the mind of Detective Corbin by 10:45 a.m., we think it clear from the record that ample probable cause for the arrest of the appellant had accumulated by 12:20 p.m. when Detective Corbin turned his attention to the appellant. Without the predicate of an unlawful detention as of that time, the elaborate theory spun out of *Wong Sun* and *Brown v. Illinois* has no foundation on which to rest. We note, moreover, that the situation here dealt with wherein the appellant presented himself to the police station, was a far cry from that condemned in *Brown v. Illinois*, at 45 L.Ed.2d 428:

> "The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that

the purpose of their action was 'for investigation' or for 'questioning.' The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." (Footnotes and references omitted)

There being no showing of a primary illegality, the question of exploitation or attenuation is moot.

### Refusal to Reopen the Case

The appellant's final contention is that Judge Ross abused his discretion in refusing to permit the appellant to reopen his case in an attempt to obtain the presence and testimony of an additional witness. In context, it is apparent that the reopening of the case would have entailed a continuance from a Friday afternoon, when the case was ready to go to the jury, until the following Monday morning.

Before adjourning for lunch on Friday, November 4, 1974, both the State and the defense had rested. Upon reconvening at 1:45 p.m., defense counsel informed the court that he had received a telephone call during the lunch hour from Miss Ola Gardiner, who worked at St. Martin's Catholic College in the Catonsville area. Miss Gardiner was calling in response to a call made to her by the appellant and, on the basis of recollection alone, offered to defense counsel the opinion that on February 1, 1974, the appellant had arrived for work at approximately 7:20 a.m. This testimony did not go to the central question of guilt or innocence and would not have exculpated the defendant. Its arguable effect would have been to impeach, at least as to the precision of her recollection, the testimony of Rita Finch to the effect that she saw the appellant standing on the corner on the morning of February 1, at "about 7:30." The impact, at most, would have been highly peripheral.

Miss Gardiner had further indicated to defense counsel

that she "absolutely refused to testify." Defense counsel attempted to call her back, after Miss Gardiner hung up, and learned from a co-worker that although Miss Gardiner was on the job, she could not be located at that time.

The trial had been scheduled for quite some time and there had, indeed, been three prior trial dates set. The name of Rita Finch had been discovered to the appellant.

No showing having been made as to why the appellant could not have learned of the existence of Miss Gardiner before the afternoon of the last day of the trial, no reasonable assurance being given as to whether Miss Gardiner would testify or as to the nature of her testimony, and the whole matter, even taking it in the light most favorable to the appellant, being no more than collateral, we cannot say that Judge Ross abused his discretion in declining to continue the case. In refusing to grant the motion, he said:

> "We were successful in bringing the case to the point where we could start argument at 2:00 o'clock and get it to the jury hopefully early this afternoon. And the only reason we didn't was because of this request first for a delay by defense counsel to the proceedings. It seems to me that the thing to do is to go ahead, send the case to the jury and then, if on motion for new trial I am persuaded that this is evidence which would have, and I assume it's a guilty verdict, if there is a guilty verdict, then, if I'm persuaded on motion for new trial there is a witness who would have testified as this mysterious person on the telephone has indicated she would, and that in my opinion that would have affected the verdict of the jury, then I can always grant a new trial. I hate to take a case to this point when we are ready to go to the jury with argument and instructions and delay it for a three or four day period in hopes that some witness will appear and give testimony which could be helpful. It serves no interest. If we don't get the witness, then how do we

explain that to the jury on Monday morning? We do get the witness to testify, that would be one thing. But we are at a juncture where we've got to delay the case for probably a three-day period, and not really certain as to what if anything is going to come after that, and certainly that is not a fair way to treat a jury."

We see no abuse of discretion.

*Judgment affirmed.*