JOSEPHINE DORSEY AND ISAIAH SYLVESTER WILSON *v.* STATE OF MARYLAND

[No. 301, September Term, 1975.]

*Decided November 28, 1975.*

98

The cause was argued before MOYLAN, GILBERT and MELVIN, JJ.

*Harold I. Glaser*, with whom was *Richard M. Karceski* on the brief, for appellant Dorsey.

*R. Lewis Bainder, Assigned Public Defender*, for appellant Wilson.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Stephen R. Tully, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

This case deals with yet another aspect of *Mullaney v. Wilbur*, 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975), as applied to the law of homicide in Maryland by *Evans v. State*, 28 Md. App. 640, 349 A. 2d 300. It is, indeed, a variation on *Brown v. State*, 29 Md. App. 1, 349 A. 2d 359, which was a variation on *Evans.*

The appellants, Josephine Dorsey and Isaiah Sylvester Wilson, were convicted in the Criminal Court of Baltimore· by a jury, presided over by Judge Basil A. Thomas, of both (1) conspiracy to commit murder and (2) murder in the first degree. Their most significant contention upon this appeal is

that the jury instruction dealing with the presumption of malice and placing upon them the burden of proving such mitigation as would negate malice was unconstitutional under *Mullaney v. Wilbur* and *In re Winship*, 397 U. S. 358, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970). We, therefore, turn immediate attention to the pertinent part of that instruction:

> "In the absence of justification, excuse or some circumstance of mitigation, the law presumes all homicides to be committed with malice and to constitute murder in the second degree. The burden is on the State to prove the elements of deliberation and premeditation which would raise the homicide to murder in the first degree. The burden is on the defendants to show the existence of mitigation, excuse, or justification which will reduce the offense to manslaughter or not guilty."

There is no longer room for doubt that that instruction was clearly improper under *Mullaney v. Wilbur*. In Part IIG of *Evans v. State*, we analyzed at great length the impropriety of such an instruction. We have declared such instructions to be improper in *Brown v. State, supra; Burko v. State*, 28 Md. App. 732, 343 A. 2d 251; and *Newborn v. State*, 29 Md. App. 85, 349 A. 2d 407.

The constitutional impropriety in a vacuum, however, is not dispositive. The impropriety rather must be judged in terms of its materiality and impact in a particular case. In *Brown v. State, supra*, we held such an improper instruction to be harmless. In *Brown*, as here, the arguable issue on which the appellant based his *Mullaney v. Wilbur* claim was that of mitigation. In *Brown*, as here, the conviction was for murder in the first degree.

In one respect, however, the present case differs from *Brown*. In *Brown*, Judge Gilbert, speaking for this Court, was able to rest the holding of harmlessness upon a dual predicate. He pointed out initially that even if mitigation had been a fair issue in the case, the verdict of murder in the first degree served to cure any improper instruction by

demonstrating that the State had carried its burden of proving every element of the offense beyond a reasonable doubt. The holding in *Brown* was supported, however, by yet a second theory. Even absent the curative effect of the first-degree murder verdict, the appellant there was not entitled to an instruction on mitigation because of his failure to generate a legitimate jury argument with respect thereto. As Judge Gilbert there summarized the situation:

> "Appellant, at trial, denied all knowledge of the crime, denied ever seeing the decedent in the bus station rest room, denied she cut her hand during an altercation with the decedent, but explained that her hand was cut before she went to the bus station. Appellant admitted, however, being at the bus depot and using the ladies' rest room. Appellant has by her own testimony expressly negated the common law offense of manslaughter through her disclaimer of all knowledge of the act. Patently, if she knows nothing of the crime, she could not have committed it in 'hot blood' or with recklessness, devoid of intention to take a human life. Even though Green spoke of the 'commotion' between appellant and the decedent, we think, in the light of appellant's testimony, that fact does not fairly inject mitigation as an issue in the case."

Because of our conclusion that the issue of mitigation was fairly generated in this case (with respect to the appellant Dorsey at least and, arguably, with respect to the appellant Wilson), our ultimate holding of harmless error must, perforce, rest upon the single foundation of the curative effect of the first-degree murder verdict alone. In one respect, the generation of the jury issue here is interesting because it arose out of the State's evidence itself (as in *Mullaney v. Wilbur*) and not out of any evidence produced by the defense. Neither appellant took the stand. Except for a stipulation as to a motel registration by way of arguable alibi for the appellant Wilson, no defense at all was offered. For reasons to be hereinafter analyzed, however, we

conclude that the State's case itself served to generate a jury issue as to mitigation. It was of this very possibility that we spoke in *Evans* in Part IF:

"[B]efore it can be said that there is in a case a legitimate jury issue on the question of justification, excuse or mitigation, there must be evidence sufficient to generate the issue. That evidence may be, but need not be produced by the defendant. It may be found in the State's own evidence. But whatever its source, unless there is evidence sufficient to generate a fair jury question (or to generate the issue in like manner in a court trial), there is no requirement that instructions in these regards even be given."

In looking initially at the threshold question of whether the evidence generated a jury issue entitling the appellants to an instruction on mitigation, we will examine the evidence, and all inferences fairly drawable therefrom, in a light most favorable to the appellants. We are by no means intimating that mitigation was persuasively established. Indeed, as will hereinafter be discussed when we look to the sufficiency of the evidence to establish conspiracy to murder (and, inferentially, to legitimate the finding of murder in the first degree), the evidence was clearly legally sufficient to establish that there was no mitigation. Preeminently, the evidence may be legally sufficient to establish either mitigation or lack of mitigation, the resolution being left to the jury.

As we look at the evidence, therefore, in the light most favorable to the appellants, that evidence will be applied to the criteria for mitigation which were clearly set out by Chief Judge Orth in *Whitehead v. State*, 9 Md. App. 7, 10-11, 262 A. 2d 316:

"But there may be a homicide which would otherwise be murder which is reduced to manslaughter by circumstances of alleviation or mitigation. Such a case is where the circumstances

surrounding the homicide establish that it was provoked. For the 'Rule of Provocation' to be invoked there are four requirements:

(1) There must have been adequate provocation;

(2) The killing must have been in the heat of passion;

(3) It must have been a sudden heat of passion — that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;

(4) There must have been a causal connection between the provocation, the passion, and the fatal act."

The deceased, Russell Blake; his girlfriend, Mary Ann Johnson; one Delores Pound; and the two appellants all shared a residence on December 30, 1973, at 2636 Loyola Southway. At approximately 1 a.m. on that date, the appellant Dorsey had been drinking heavily. The appellant Wilson had been drinking to some lesser extent. The two appellants apparently lived together as man and wife. At 1 a.m., the appellant Wilson went to the nearby Preakness Bar. The appellant Dorsey arrived home and immediately got into an argument and at least a minor scuffle with Delores Pound, who was then in her ninth month of pregnancy. Russell Blake intervened. Extracting from the somewhat confused factual accounts that version most favorable to the appellants, the ensuing struggle between Blake and the appellant Dorsey became heated. Blake was a big man physically. With assorted pushing and shoving, the fight moved down a hallway to a stairway. There were at least some indications that the appellant Dorsey was thrown down the steps by Blake. The police were summoned and the disturbance was quelled. The appellant Wilson arrived home at about that time and helped to calm down the appellant Dorsey. The appellant Wilson removed the appellant Dorsey from the area.

At approximately 6 a.m., the appellants returned. Three boys were with them, two with sticks and one with a chain. All five entered Blake's bedroom, where he was sleeping with Mary Ann Johnson, and began to beat him. The appellant Wilson accused Blake of having thrown the appellant Dorsey down the stairs. Blake responded, "Man, I didn't throw her down. She fell down." The appellant Dorsey interjected, "Don't believe him. He did throw me down the step." The fighting continued in the bedroom and in an adjacent hallway. Blake knocked down one of the boys and then ran down the stairs. The appellant Wilson moved to the kitchen and obtained a butcher knife. He ultimately stabbed Blake in the neck, causing him to bleed to death.

We turn initially to the question of the adequacy of the provocation. Although there are, to be sure, versions of the facts far more favorable to the victim Blake, we are required at this juncture to take that version most favorable to the appellants. If Blake either engaged in a mutual affray with the appellant Dorsey or unnecessarily battered the appellant Dorsey by throwing her down the stairs, the law would indicate that this would be at least a jury question with respect to legally adequate provocation. Moreland, *The Law of Homicide* (1952), points out, at p. 76:

> "While a trivial blow is not sufficient, a substantial battery upon the defendant or a close relative will justify the reduction of an intentional homicide to voluntary manslaughter. A clout with a heavy hickory stick and a blow upon the back of the head with a pistol represent illustrations of the type of injury required.
>
> ... It is true that the law does not permit or excuse the taking of life in assault and battery cases for anything less than a cause which would justify a plea of self-defense, — a fear of grievous bodily harm or of death. But while the law does not excuse such a homicide, it does recognize the commonly accepted opinion that a substantial assault or battery may well provoke such heat of

passion as to justify the reduction of the crime to manslaughter. This is precisely the reasoning that is used in the other categories of legal provocation and is as sound a social policy in this instance as in the others."

To a similar effect is Perkins, *Criminal Law* (2d Ed., 1969), at p. 60:

"Knocking a person down with a heavy stick, or hitting him over the head with a revolver, are rather obvious instances of such force; but a weapon is not indispensable for this purpose. Thus even a blow with the fist may be sufficient to reduce an intentional killing to manslaughter, particularly if it is a blow in the face or a 'staggering' blow."

See also Clark and Marshall, *Law of Crimes* (6th Ed., 1958), at p. 623:

"Every man, when assailed with violence or great rudeness, is inspired with a sudden impulse of anger, which puts him upon resistance before time for cool reflection; and if, during that period, he attacks his assailant with a deadly weapon, even with intent to kill, and death ensues, it is regarded as done through heat of blood, and, unless malice is shown by the circumstances, the killing is only manslaughter. To reduce the killing to manslaughter, the assault must have been with violence or great rudeness, and must have been reasonably calculated to excite passion and heat of blood."

The situation with respect to the appellant Wilson in terms of the legal adequacy of the provocation is more tenuous. If he was provoked, he was provoked vicariously out of regard for the appellant Dorsey. Whether such vicarious provocation can ever be deemed legally adequate, we will not now decide. For present purposes, we will simply

operate upon the assumption that the appellant Wilson was provoked by legally adequate provocation. In this regard, we do note LaFave and Scott, *Criminal Law* (1972), at p. 577, which indicates that this may at least be a jury issue:

> "*Injuries to third persons.* Just as a reasonable man may be provoked by some sorts of conduct which inflict injury upon himself, so too he may be provoked by the same sort of conduct which causes injury to his close relatives. It has been held that the rule does not extend beyond close relatives to more distant relatives and friends, but in view of the modern tendency to leave questions of the reasonableness of a provocation to the jury, there ought not to be any absolute rule that injuries, however grievous, to friends, however close, can never constitute a reasonable provocation."

With respect to the additional requirement, as set out in *Whitehead*, that the killing must have been in the actual "heat of passion," we think the evidence permitted a fair inference that both appellants were at 6 a.m. still acting in such heat of passion (whether reasonably or unreasonably is a question yet to be considered). We think further, with respect to the causal connection requirement set out in *Whitehead*, that the evidence fairly permitted a finding that the passion was the result of the provocation and that the fatal act was the result of the passion.

The more difficult problem, even in the limited terms of finding a fair jury question, is in dealing with the additional requirement that, from the point of view of a reasonable man, the passions would not have cooled. We are, however, not dealing with days but with a period of approximately five hours and with a domestic squabble exacerbated by the inferentially heavy effects of alcohol. Although the defense theory must strain even to cross the threshold of generating a jury issue, we are not prepared to say that the passions must have cooled, as a matter of law. The authorities all indicate that whether the passions of a reasonable man would cool under certain circumstances should ordinarily be

a question for the jury. In this regard, LaFave and Scott, *op.cit.*, say, at p. 580:

"What constitutes a reasonable cooling time in a particular case depends upon the nature of the provocation and the circumstances surrounding its occurrence — a matter to be determined by the jury as a question of fact, unless the time is so short or so long that the court may hold that, as a matter of law, it was reasonable or unreasonable."

Perkins, *op.cit.*, offers the opinion, at p. 68:

"But when it was recognized that it was to be tested by a standard it became obvious that the law merely supplied the standard — a reasonable man under like circumstances — and whether that test was met in the particular case was a question of fact for the jury, except that it need not be submitted to the jury if the period is so short, or so long, that the minds of reasonable men could not differ in the conclusion to be reached."

Clark and Marshall, *op.cit.*, well articulates the applicable law, at pp. 633-634:

"*Questions of Law or Fact.* — Some of the older cases held that whether there was reasonable time for cooling is a question of law to be decided by the court upon consideration of the length of time and all the other circumstances found by the jury on a special verdict, or else to be given to the jury in the court's charge. This, however, is erroneous. The sounder practice is to leave the question to be determined by the jury as a question of fact, under proper instructions, and by a general verdict. Whether, under all the circumstances, there was time for the passions of an ordinary man to cool must depend upon the nature of man and the law of the human mind, as well as upon the nature and circumstances of the provocation, and in ordinary cases is essentially a question of fact for the jury."

Even granting, however, that the evidence generated a fair jury question on the issue of mitigation, the jury's verdict of guilty of murder in the first degree cured any error in the instructions. Just as the evidence was arguably sufficient for the jury to find mitigation, it was bountifully sufficient for the jury to find beyond a reasonable doubt, as they did, that the killing was deliberated and premeditated. As we said in *Evans,* in Part IC:

> "By the same token, any error in instructing as to the allocation of the burden of persuasion on the subject of mitigation (such mitigation, for purposes of holding the homicidal *mens rea* down to the manslaughter level, being fairly an issue in the case) will have been cured by a verdict of murder in the first degree. The evil aimed at by *Mullaney v. Wilbur,* where the issue is manslaughter versus murder, is that a presumption of malice unfairly relieves the State of the burden of proving non-mitigation (mitigation being fairly an issue in the case). Where the ultimate verdict is that of murder in the second degree, the presumption may, therefore, have been pivotal. Where, on the other hand, the verdict is murder in the first degree, the State will have proved every element, including the negating of hot blood, beyond a reasonable doubt and due process will not have been offended."

In this regard, we will here interject a brief consideration of the appellants' second contention — questioning the legal sufficiency of the evidence to establish the crime of conspiracy to murder — because of the bearing it has on the amplitude of proof to show a planned and deliberated murder. The officer who quelled the disturbance at 1 a.m. heard the appellant Dorsey say to the appellant Wilson as they were leaving the scene, "You ought to mess him up." The appellant Dorsey's brother-in-law, Julian Paul Mc-Means, testified that both appellants were at his house at 5 a.m., one hour before the murder. The appellant Dorsey said, referring to Blake, that she "was going to have that

m.f. killed this day." Both appellants left the company of McMeans shortly thereafter. The appellant Wilson indicated the well-directed nature of his attack at 6 a.m. when, as one of the boys hit Mary Ann Johnson, he ordered him off with the words, "Don't touch her, she ain't in this." He later said, "Russell is the one we want." That revenge was the clear motive of the killing was well established when at one point the appellant Wilson and Blake seemed to be reaching some detente. The appellant Dorsey suddenly came up and said, "You going to let him get away with what he did to me?" Remotivated, the appellant Wilson replied, "Hell no, I ain't going to let him get away with it." While obtaining the butcher knife from the kitchen, the appellant Wilson said, "This mother fucker going to die tonight." The evidence was legally sufficient to establish that the two appellants conspired together and reached an agreement to take the life of the victim. On the conspiracy charge, the State bore the burden of proving every element, including that of the murderous design, beyond a reasonable doubt. As to first-degree murder, moreover, the State bore the burden of proving wilfulness, premeditation and deliberation beyond a reasonable doubt. The finding of those elements by a jury, *ipso facto*, negated the element of "hot blood" or "heat of passion." The situation, therefore, is as was described by Judge Gilbert, in *Brown v. State, supra*:

> "Similarly, an erroneous instruction concerning an accused's burden of lowering the offense from second degree murder to manslaughter is likewise cured because the State has negated to the satisfaction of the trier of fact, any mitigation. The net result, in such cases, of incorrect instruction where mitigation or 'hot blood' is not an issue fairly in the case, is that the instruction, at worst, is harmless beyond a reasonable doubt under *Harrington v. California*, 395 U. S. 250, 254, 89 S. Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967), and, at best, a gratuity given for the benefit of the accused and to which he was not entitled."

In denying a writ of habeas corpus in the case of *Wilkins v. Maryland*, 402 F. Supp. 76 (1975), Judge C. Stanley Blair in the United States District Court for Maryland reached a similar conclusion. It was of this very situation that we spoke in *Evans v. State*, in Part IC:

"The State, in proving wilfulness, deliberation and premeditation beyond a reasonable doubt, will not have relied upon a mere presumption of malice but will of necessity have *proved* the element of malice (meaning, within the context of this analysis, an intentional killing absent the mitigating circumstance of a hot-blooded response to a legally adequate provocation). 'Malice and heat of passion cannot coexist.' 40 Am.Jur.2d, *Homicide*, § 56, p. 350, citing *Vaughan v. State*, 201 Ala. 472, 78 So. 378, and *White v. State*, 44 Tex. Crim. 346, 72 S. W. 173. *A fortiori*, proof beyond a reasonable doubt of premeditated and deliberated malice will negate heat of passion. The requirement of *In re Winship* and *Mullaney v. Wilbur* that the State prove beyond a reasonable doubt every necessary element of the offense will have been fully satisfied."

The remaining two contentions, raised by the appellant Wilson alone, need not detain us long. Wilson complains that he was foreclosed from eliciting from a State's witness, on cross-examination, "evidence regarding alleged past accounts of violence by the deceased and of the decedent's violent and dangerous character, which were known to the defendant." Such evidence, which might in other **circumstances have a bearing on some question of** self-defense, dealt here with an issue which was not remotely material. In view of the concerted action of both appellants, along with the three boys who accompanied them, in taking the attack to the deceased as he lay asleep in his bed five hours after the alleged initial provocation, there is no remote issue of self-defense in this case. Although the evidence might indeed have been relevant on the question

of self-defense, the question of self-defense was itself immaterial in the context of this case. The evidence, therefore, was properly excluded.

The appellant Wilson's final contention is that the court erred in denying a motion for a mistrial when a State's witness, on redirect examination, testified "that she did not sleep with Ike because of something he did to his prior wife." The defendant's objection was sustained and the matter was not pursued. In the exercise of its discretion, the court determined that this cryptic and unexplained reference did not in and of itself justify aborting a long and complicated jury trial. We see no abuse of discretion in that decision.

*Judgments affirmed.*