617 A.2d 1130

**Daveta Michelle CONWAY**

v.

**STATE of Maryland.**

No. 391, Sept. Term, 1992.

Court of Special Appeals of Maryland.

Jan. 7, 1993.

Melissa M. Moore, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Submitted before MOYLAN, ALPERT and FISCHER, JJ.

MOYLAN, Judge.

The appellant, Daveta Michelle Conway, was convicted by a Prince George's County jury, presided over by Judge Graydon S. McKee, III, of second-degree murder and carrying a weapon openly with intent to injure. Upon this appeal, she raises the following two contentions:

1. That Judge McKee erroneously refused to instruct the jury on the law of manslaughter; and

2. That Judge McKee erroneously refused to permit relevant testimony about the appellant's state of mind.

Both contentions go to the same issue and it will be helpful, therefore, to set the factual picture at least in large outline. At approximately 2 A.M. on September 30, 1990 in

the area of Olive Street near Eastern Avenue in Prince George's County, a "cutting" occurred. It was the culmination of a series of drunken and disorderly episodes over the course of perhaps thirty minutes. The appellant, in a nutshell, insinuated herself gratuitously into a retaliatory venture embarked upon by her own mother. By no stretch of the imagination was the appellant's intervention a response to legally adequate provocation, one of the necessary conditions for invoking the so-called "rule of provocation" as a mitigating circumstance for murder.

The appellant had nothing to do with the initial incident. Two automobiles carrying eight to ten persons were proceeding from 14th and C Streets in the District of Columbia to the T & T Carryout, outside of which the fatal "cutting" ultimately occurred. The second of the two automobiles was being driven by Eric Wellington, with Gloria Coplins as his passenger. The automobile was a 300ZX. As he was driving to the T & T Carryout, at approximately 1:30 A.M., the appellant's mother, apparently drinking, walked in front of his car and then hit the glass on the passenger side of it with a bottle. Mr. Wellington stopped, got out, and "had words" with her. He reentered his car and proceeded to the T & T Carryout.

Rejoining his friends at the T & T Carryout, Mr. Wellington was apparently still feeling some chagrin, however, at the attack upon his car. According to his passenger:

"Eric, he pulled up at the store, and asked Nat and them if she wanted to make $10. So she said, want to do what? And he said, want to 'F' this thing up for. So Nat said, sure, to me. So we kept going up and we went to the wrong corner. She said, it's not us, it's her up there. So Eric went up this and he said I should have smacked you. Then he hit her, and him and her starting fighting."

Mr. Wellington sought to recruit one of the ladies in his party, Ms. Lynette Brown, to make manifest his chagrin when he offered her $10 to "beat this bitch's ass." Ms. Brown, Mr. Wellington, and two of their friends all went looking for the lady. Mr. Wellington opened the conversa-

tion with her by saying, "Bitch, I ought to smack you in your face," and then he did so. Mr. Wellington's version of the encounter was:

"A: As I was walking towards her, asking her what was the purpose for hitting my car, she had a bottle in her hand. She attacked me with it, which I did pushing her down on the ground. And she tried to kick me. I grabbed her, pushed her down again.

Q: When she tried to kick you, what did you do?

A: I grabbed her leg, threw her to the ground.

Q: Then after you threw her to the ground, what happened?

A: Nothing really. Turned back and went to T and T."

Although as many as three of his female companions were standing around at the time of Wellington's confrontation with the appellant's mother, there is no suggestion in the evidence that anyone other than Wellington ever touched the mother in any way.

George Mimms, the ultimate murder victim, incidentally, had nothing to do with either the initial confrontation between Eric Wellington and the appellant's mother or with the subsequent renewal of that confrontation. George Mimms not only did not participate in any of the confrontations between Eric Wellington and the appellant's mother, he was not even present as a witness to them. George Mimms was simply in the wrong place at the wrong time. He was one of the group that had driven to the T & T Carryout in the lead car, a Toyota Cressida, chauffeured by Sergio Chamblis. Their ride was uneventful. When the party arrived at the T & T Carryout, everybody got out of the car and entered the carryout except for George Mimms and Sergio Chamblis. They drove to a nearby liquor store. After making a purchase, they returned to the T & T Carryout. Chamblis went inside but George Mimms remained in the back seat of the Toyota the entire time.

Meanwhile, the appellant's mother, Jacqueline Conway, had reached the safe haven of her home. She did not

testify and the circumstances of her brief return home were recounted by a friend who lived in the same house with her, Renee Anderson. Renee Anderson and the mother had been drinking throughout the course of that evening. It was Renee Anderson, in the first instance, who had sent the mother off, at between 1 and 2 A.M., to go to the liquor store for her. She was sitting on the front steps as the mother returned home. She described the mother's condition as having a "kind of swollen" face, with her forehead "kind of cut" and her mood "upset." The mother entered the home, apparently armed herself with a bat or big stick, and left again, saying nothing to Renee Anderson.

It was at that point that the appellant first became involved. Just after the mother returned home and then, almost immediately, left again, the appellant's younger sister awoke the appellant. Based on what her sister told her, the appellant immediately jumped up, grabbed her coat *and a knife* and went after her mother. She testified that she thought her mother had been beaten by a group of guys, was hurt and was in danger.

The appellant caught up with her mother before hostilities were renewed. She had time to question her mother about what had happened before her mother made it all the way back to the crime scene. As the appellant put it, "I didn't know what to think. I was asking my mother what was going on, you know." The appellant did not keep her mother out of danger by restraining her from initiating a new round of violence. The appellant gave no indication that she made any attempt to do so. Lest her mother be outnumbered, the appellant apparently simply reinforced her as the two of them proceeded to seek out the objects of the mother's wrath:

> "I asked my mother what had happened to her, what was going on, and she didn't—she didn't tell me what was going on. She said that, well, *she said,* somebody jumped on me, and *I got in a fight,* and I think I am not coming back—but *I am going back.* By the time she said that we were there.

Q: Okay.

A: Okay.

Q: *What did she do?*

A: *She was looking for them."* (emphasis supplied).

From start to finish, the appellant's concern appears to have been primarily for her mother's safety. That concern, however, did not manifest itself by attempting to prevent or to dissuade the mother from instigating a new round of violence. It manifested itself, rather, by joining forces with the mother so that the mother would not be hopelessly outnumbered. It is not without significance that the appellant armed herself with a knife. The appellant, albeit apparently motivated by nothing more than filial concern, enlisted in her mother's course of criminality. The law neither permits that nor even recognizes it as a mitigating factor.

Between the earlier confrontation involving Eric Wellington and the appellant's mother in the alley and the renewal of violence by the appellant and her mother, an interval of between ten and fifteen minutes intervened. When the appellant and her mother returned to the vicinity of the T & T Carryout, Eric Wellington was not there. He was still inside the carryout. The mother's attention, moreover, focused not on Eric Wellington's 300 ZX with which she had had earlier contact but rather upon Sergio Chamblis' Cressida, which had theretofore been uninvolved. What caught the mother's attention was that approximately three of the young women who had been present when she had her earlier fight with Eric Wellington were seated in the Cressida. The only male in the Cressida was George Mimms, who had theretofore not had even remote contact with the appellant's mother in any way.

A number of witnesses described the resumption of hostilities. Sergio Chamblis, whose Cressida was ultimately damaged, was just coming out of the carryout when he observed "a lady bust my window out of the car." The

window was the back window. The lady was the appellant's mother.

Gloria Coplins was sitting in the Cressida, talking and listening to music. She first became aware of the appellant and the appellant's mother when they "began to bang on the windows." Everyone then hopped out of the car and, shortly thereafter, Gloria Coplins noticed that George Mimms had been stabbed in the back.

Helen Fisher was simply listening to music when "they came and busted open all the windows." Somehow, she herself got hit in the back with a pole. Tammy Smith was seated in the front seat of the Cressida "when people started breaking the windows." Shortly after she got out of the car, she noticed George Mimms lying on the ground. Eric Wellington was inside the carryout when he heard a loud noise, came to the door, and saw a woman "breaking the back window of Sergio's car." He subsequently gave chase to the woman and her companion. One of them had a bat and a knife and the other had a stick.

The appellant's own version of the events is equally devastating to her cause. As she and her mother approached the carryout, her mother pointed and said, "There they are." As the mother started banging on the back window of the Cressida with a stick, the appellant, instead of restraining her mother, took a bottle off the ground and threw it at the car. The appellant observed that her mother had broken the rear window of the Cressida. At that point, people started jumping out of the car.

By way of explanation for stabbing George Mimms, the appellant simply testified that her mother "started jumping on this guy" and the appellant then jumped on him too and stabbed him in the back. George Mimms died of a single stab wound to the upper back of the left chest.

■ The appellant's first contention is that Judge McKee erroneously declined to instruct the jury on the subject of manslaughter, specifically its "rule of provocation" variety. The appellant, of course, was not entitled to such an instruc-

tion. The appellant failed utterly to meet her burden of production by showing a *prima facie* case of provocation. She failed to generate a genuine jury issue in that regard.

Although the flaws in her case for mitigation are many, it will suffice for us to discuss but two of them. Whatever the provocation, it is, of course, required that the homicidal agent be acting in hot blood. There was no testimonial suggestion from the appellant herself or from others to establish that the appellant acted in hot blood. There is no suggestion that she was even angry. She would not have gone to seek out those mid-morning visitors to the T & T Carryout. She had no quarrel with any of them and no cause for quarrel with any of them. She certainly had no quarrel with George Mimms.

A second fatal lack in the appellant's effort to generate a defense based on provocation is that the evidence gave not the remotest hint of any legally adequate provocation. There was no mutual affray. The appellant and the appellant's mother were the sole and exclusive aggressors. Even from the mother's point of view, there was no legitimate response to an earlier battery. The target for such a response would have had to have been Eric Wellington. The female occupants of the Cressida were nothing more than apparent associates of Eric Wellington. George Mimms was even more remotely involved, as an associate of those associates. There was no possible theory of self-defense or defense of others (of mother). When the appellant jumped onto George Mimms' back and fatally stabbed him, he had not been fighting the appellant's mother. The appellant's mother had been attacking him. There was no glimmer of legally adequate provocation and it would be to dignify unduly the appellant's theory to discuss the question further.

The appellant's second and final contention is that neither she herself nor Renee Anderson was permitted to testify as to what the appellant's sister Cynthia Harvey had said to her as she was first awakened after her mother

returned and then left again. For starters, the thrust of what they said clearly emerged from her testimony. All that they knew was that the mother had returned home looking disheveled and beaten, armed herself with something or other, and immediately went back out looking for her adversaries. A few sentences of testimony might have elaborated slightly on that, but, elaborated or unelaborated, such information passed on to the appellant would not have established a predicate for the legal provocation necessary to mitigate a murder down to a manslaughter.

An alternative answer, if such be needed, to the contention is that the appellant made no proffer as to what the excluded testimony would have been. *Jackson v. State*, 92 Md.App. 304, 320–321, 608 A.2d 782 (1992).

JUDGMENTS AFFIRMED;

COSTS TO BE PAID BY APPELLANT.