7 A.3d 197

Antajuan Lawntee WILSON

v.

STATE of Maryland.

No. 0497, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Oct. 28, 2010.

648

650

652

Sherrie B. Glasser (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Jeremy M. McCoy (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., MATRICCIANI and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, JR., J. (Retired, Specially Assigned).

The primary focus of this opinion will be on the possibly mitigating influence of imperfect self-defense in criminal homicide cases. The mitigating defenses generally, even when successfully established, do not, of course, exculpate a defendant. Far from it. Even the successful defendant (successful in this limited regard) will still be a convicted felon facing a possible prison sentence of ten years. In the case of criminal homicide, however, because of its graduated levels of punishment based on graduated degrees of moral or mental blameworthiness, the law will sometimes lower the level of blameworthiness from the murder to the manslaughter level because of certain extenuating circumstances. *Cunningham v. State,* 58 Md.App. 249, 253, 473 A.2d 40, *cert. denied,* 300 Md. 316, 477 A.2d 1195 (1984) ("The various grades of felonious homicide are but efforts by the law to recognize, for purposes of assessing appropriate punishment, different levels of blameworthiness"); *Glenn v. State,* 68 Md.App. 379, 401, 511 A.2d 1110, *cert. denied.* 307 Md. 599, 516 A.2d 569 (1986); *Bryant v. State,* 83 Md.App. 237, 244, 574 A.2d 29 (1990).

As a secondary theme, we will also examine in some detail the mitigating defense of hot-blooded response to legally adequate provocation, frequently referred to simply as the Rule of Provocation.

### The Maryland Reception of Imperfect Defenses

As relatively arcane ameliorating influences, the imperfect defenses, as a group, have only recently been recognized in Maryland. Imperfect self-defense (along with the imperfect defense of others [1] and the imperfect defense of habitation) was first mentioned in Maryland case law by way of dicta in *Evans v. State*, 28 Md.App. 640, 658 n. 4, 349 A.2d 300 (1975), *aff'd*, 278 Md. 197, 362 A.2d 629 (1976). In *Faulkner v. State*, 54 Md.App. 113, 114–15, 458 A.2d 81 (1983), aff'd, 301 Md. 482, 483 A.2d 759 (1984), Judge Orth (former Chief Judge of this Court, then retired from the Court of Appeals, and specially assigned to this Court) recounted the Maryland reception of this very significant new addition to this State's homicide law:

> From the turbulent waters of the criminal law of Maryland, roiled by the dictates of *Mullaney v. Wilbur* (1975), emerged an esoteric qualification to the doctrine of self-defense, known as the "imperfect right of self-defense." We noticed it in *Evans v. State*, recognized it in *Shuck v. State*, mentioned it in *Wentworth v. State* [29 Md.App. 110, 349 A.2d 421 (1975) ], and applied it in *Law v. State* [29 Md.App. 457, 349 A.2d 295 (1975) ]. The Court of Appeals of Maryland has not yet addressed the matter.

> *In the frame of reference of legal history, the doctrine of imperfect self-defense is of recent origin, and scholars of the law have referred to it as "not yet far advanced."* LaFave and Scott, *Criminal Law* (1972), § 77. We speculated in *Evans* that it is "little more than an academic possibility." But, as we discovered in *Shuck* and *Wentworth*, the impact of *Mullaney* has made the qualification viable and rendered

---

1. An excellent and definitive analysis of the defense of others, both perfect and imperfect, can be found in the recent opinion of Judge Deborah Eyler for the Court of Special Appeals in *Lee v. State*, 193 Md.App. 45, 996 A.2d 425 (2010).

it more than academic. *There are indications that defense counsel are now invoking it, and the bench and prosecutors had best take heed.*

(Emphasis supplied). *See also* Moylan, *Criminal Homicide Law* (MICPEL, 2002), § 10.1, "The First Recognition of Imperfect Defenses in Maryland," p. 192:

As it undertook the systemic overhaul of homicide law necessitated by *Mullaney v. Wilbur, the Court of Special Appeals,* collectively and under the leadership of Chief Judge Charles E. Orth, *made a deliberate policy decision. Rather than fragment into a dozen isolated pieces the analysis undergirding the widespread changes, that court deemed it advisable to place all of the analysis in the single central repository of Evans v. State.* Recognizing that 90 percent of the *Evans* opinion would thereby be *dicta, the court also decided to follow it up immediately with a series of other decisions* that would apply the *Evans* analysis to various concrete circumstances. *One day after Evans was issued, seven follow-up opinions were filed on Nov. 26. With a day off for Thanksgiving, four more followed on Nov. 28.* Informally, the entire package was known among the judges of the Court of Special Appeals as the "dirty dozen." In any event, *a large percentage of what was mere dicta on Tuesday was locked into a series of solid holdings by the close of business on Friday.* It enhances understanding to appreciate that *the Evans opinion does not stand alone but is rather the focal point for a galaxy of 12 intricately interwoven opinions, all decided within a 72–hour period.*

(Emphasis supplied).

The role of the Court of Special Appeals in completely rewriting the homicide law of Maryland in 1975, in the wake of the Supreme Court's *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508, was trail blazing. The recognition of the imperfect defenses was but a part of a more sweeping reappraisal of homicide law generally. The Court of Appeals joined in recognizing imperfect self-defense in its affirming

decision in *State v. Faulkner,* 301 Md. 482, 483 A.2d 759 (1984).

## The Present Case

The appellant, Antajuan Lawntee Wilson, was convicted by a Howard County jury, presided over by Judge Richard S. Bernhardt, of murder in the first degree and related offenses. On appeal, he contends:

1. that Judge Bernhardt erroneously declined to give a requested jury instruction on the subject of imperfect self-defense;

2. that Judge Bernhardt erroneously declined to give a requested jury instruction on the subject of the defense of provocation; and

3. that Judge Bernhardt committed plain error by failing, *sua sponte,* to instruct the jury on the two mitigating defenses with respect to the crime of assault in the first degree.

## The Marquee Issue

At approximately 11:00 A.M. on the morning of April 9, 2008, in an area known as Bryant Woods in Columbia, the appellant shot Brian Adams four times. Adams died of "multiple gunshot wounds." The appellant was indisputably the homicidal agent. The only issue before us is whether the evidence generated at least the reasonable possibility that the appellant, because of extenuating circumstances, may have been guilty only of manslaughter rather than of murder. We will now look first at imperfect self-defense as a possible set of extenuating circumstances.

## A Belligerent and Boorish Milieu

By way of deep background (albeit only about ten minutes deep), the appellant relies heavily on the angry and belligerent atmosphere created when the appellant and Brian Adams first crossed each other's path shortly before the fatal shooting. The appellant seeks to extenuate the killing because of, in

significant measure, the lingering effects of that toxic atmosphere.

The homicide victim, Brian Adams, and his two "homeboys," Bryant Keene and Brandon Mitchell, had been driving in Columbia when Adams's car ran out of gas. Pulling it over on Twin Rivers Road, they walked to a nearby Crown Station to purchase gas. Present at the station were Walter Richardson and his friend, Christopher Harvey. Also on the scene was the appellant, who lived with his grandmother nearby and who had just walked to the Crown Station to buy a pack of cigarettes. As Adams and his "homeboys" arrived, the appellant glanced at Adams. Adams rudely retorted, "What the fuck is you looking at?" He demanded of the appellant whether he had a problem. The appellant replied, "No, it aint no problem." The appellant testified that Bryant Keene then "looked like he wanted to fight." The appellant further recounted that Keene threatened to "pluck" him, interpreting that to mean "shoot me or something." Keene, at trial, acknowledged having said to the appellant, "We'll fuck you up" and "Fuck, we could beat you up right now." As the appellant began to walk away from the station, Keene took a step in pursuit but was stopped by Brandon Mitchell. Keene further testified that had Mitchell not held him back, he would have "popped" the appellant.

That potentially explosive situation, however, ugly as it had become, was then defused as the appellant, according to Walter Richardson, stated, "I don't want no beef," took his cigarettes, and walked away. Adams and the "homeboys," for their part, filled a can with gasoline and walked down Twin Rivers Road toward their car. The appellant went in a different direction toward his grandmother's house, which was several minutes away. Once Adams and his buddies drove away, the explosive potential would have totally dissipated. They were not from the neighborhood. The conflict had, for all intents and purposes, run its course—unless someone chose to reopen it. We will turn to the evidence of ensuing events as we take up our discussion of the appellant's contentions.

### Perfect Self–Defense

With respect to criminal homicide (and several of its close shadow crimes), self-defense is a full and perfect defense if the evidence satisfies five requirements. Four of those requirements were well stated by Judge Cole in *State v. Faulkner,* 301 Md. at 485–86, 483 A.2d 759:

> We have summarized the elements necessary to justify a homicide, other than felony murder, on the basis of self-defense in the following terms:
>
> (1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
>
> (2) The accused must have in fact believed himself in this danger;
>
> (3) The accused claiming the right of self defense must not have been the aggressor or provoked the conflict; and
>
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*See also Dykes v. State,* 319 Md. 206, 211, 571 A.2d 1251 (1990); *State v. Martin,* 329 Md. 351, 357, 619 A.2d 992 (1993); *State v. Marr,* 362 Md. 467, 473, 765 A.2d 645 (2001); *State v. Smullen,* 380 Md. 233, 252, 844 A.2d 429 (2004).[2]

 In what may be categorized as a fifth requirement or may, alternatively, be characterized simply as an interpretive gloss on the first or fourth requirement, there is also an inhibiting principle that has been denominated the "retreat rule." The "retreat rule" was described in *Bruce v. State,* 218 Md. 87, 97, 145 A.2d 428 (1958), as "the duty of the defendant to retreat or avoid danger if such means were within his

---

**2.** Our analysis in this case concerns the use of deadly force in alleged self-defense in a homicide case. The use of non-deadly force in self-defense, typically asserted in assault cases, can involve some very different rules. What is said in this opinion in the context of deadly force, therefore, should not heedlessly be applied in that very different context of non-deadly force.

power and consistent with his safety." In *Gainer v. State*, 40 Md.App. 382, 387, 391 A.2d 856, *cert. denied*, 284 Md. 743 (1978), Judge Moore stated the requirement:

It is the duty of the defendant to retreat or avoid danger if the means to do so are within his power and consistent with his safety; but if the peril is so imminent that he cannot safely retreat, he has a right to stand his ground and defend himself.

*See also Corbin v. State*, 94 Md.App. 21, 25, 614 A.2d 1329 (1992).[3]

In this case, the appellant requested a jury instruction on perfect self-defense. The request was denied. The appellant has not appealed that denial.

### Imperfect Self–Defense

■ Perfect self-defense demands, in three separate regards, not only that a defendant genuinely possess certain subjective beliefs about the exigency he is facing but also that those beliefs be objectively reasonable. By contrast, imperfect self-defense, a defense that does not exculpate but only extenuates, demands only that the defendant actually possess those subjective beliefs even if those beliefs are not objectively reasonable. With respect to the first of those beliefs, Judge Orth in this Court's *Faulkner v. State*, 54 Md.App. at 115, 458 A.2d 81, described the step downward from the perfect defense to the imperfect defense:

Perfect self-defense requires not only that the killer subjectively believed that his actions were necessary for his safety but, objectively, that a reasonable man would so consider them. *Imperfect self-defense, however, requires no more than a subjective honest belief on the part of the killer that his actions were necessary for his safety, even though, on an objective appraisal by a reasonable man, they would not*

---

**3.** There is an exception, not here pertinent, to the "retreat rule." An individual is under no duty to retreat in his own home. This exception is generally referred to as the "castle doctrine." *See Barton v. State*, 46 Md.App. 616, 618–21, 420 A.2d 1009 (1980).

*be found to be so.* If established, the killer remains culpable and his actions are excused only to the extent that mitigation is invoked.

(Emphasis supplied).

In its *State v. Faulkner,* 301 Md. at 500–01, 483 A.2d 759, the Court of Appeals dealt with the various mental permutations that might produce various verdicts.

(1) [I]f the jury concluded the defendant did not have a subjective belief that the use of deadly force was necessary, *its verdict would be murder;* (2) if the jury concluded that the defendant had a reasonable subjective belief, *its verdict would be not guilty;* and (3) if the jury concluded that the defendant honestly believed that the use of force was necessary but that this subjective belief was unreasonable under the circumstances, then *its verdict would be guilty of voluntary manslaughter.* The reason courts have reached the third conclusion is that the conduct of the defendant in these circumstances negates the presence of malice, a prerequisite to a finding of murder, but the defendant is nevertheless to blame for the homicide and should not be rewarded for his unreasonable conduct.

(Emphasis supplied).

Perhaps the clearest statement of the difference between the defenses was made by Judge Wilner in *Burch v. State,* 346 Md. 253, 283, 696 A.2d 443 (1997):

Imperfect self-defense . . . "stands in the shadow of perfect self-defense." . . . *[T]he only substantive difference between the two doctrines,* other than their consequences, *is that, in perfect self-defense, the defendant's belief that he was in immediate danger of death [or] serious bodily harm or that the force he used was necessary must be objectively reasonable.* In all other respects, the elements of the two doctrines are the same.

(Emphasis supplied).

The requirement of a subjectively genuine belief also applies to the "duty to retreat" element of the defense. *Burch v. State,* 346 Md. at 283–84, 696 A.2d 443, referred to this aspect

(whether counted as a fifth element or as a gloss on the other elements) of the law of self-defense.

> *One of the elements* of the defense of self-defense *is "the duty of the defendant to retreat* or avoid danger if such means were within his power and consistent with his safety."

> ... Appellant was required by the law to retreat when confronted by Mr. Davis unless he could not safely do so. *Because this instruction dealt with imperfect self-defense, it was only necessary that appellant subjectively believe that retreat was not safe, and that is what the jury was told.*

(Emphasis supplied).

*State v. Marr,* 362 Md. 467, 473, 765 A.2d 645 (2001), explained how the "subjectively genuine albeit objectively unreasonable" distinction figures in no less than two of the standard elements of self-defense.

> The prospect of "imperfect" self-defense arises when *the actual, subjective belief on the part of the accused* that he/she is in apparent imminent danger of death or serious bodily harm from the assailant, requiring the use of deadly force, *is not an objectively reasonable belief. What may be unreasonable is the perception of imminent danger or the belief that the force employed is necessary to meet the danger, or both.*

(Emphasis supplied). *See also State v. Smullen,* 380 Md. 233, 251–53, 844 A.2d 429 (2004) ("A person laboring under the honest subjective belief that he/she was, indeed, in apparent imminent danger of death or serious bodily harm and that the force used was necessary to meet the danger cannot be found to have acted out of malice.").

### The Burden of Production on the Appellant

The critical appellate question is almost always, "Who has the burden of proof?" A defendant is only entitled to an instruction with respect to issues that have been generated by the evidence. Unless the State has gratuitously accomplished the job for him, that burden of generating an

issue falls on the defendant. Although the due process clause protects a defendant from having imposed on him the ultimate burden of persuasion, there is no such protection with respect to the lesser and antecedent burden of production. As Judge McAuliffe pointed out for the Court of Appeals in *Sims v. State,* 319 Md. 540, 553, 573 A.2d 1317 (1990):

> Although the ultimate burden of proving the absence of mitigation rests upon the State when that issue is properly in the case, *the burden of initially producing "some evidence" on that issue* (or of relying upon evidence produced by the State or adduced from witnesses called by the State) *sufficient to give rise to a jury issue with respect to mitigation, is properly cast upon the defendant.* Sims was singularly unsuccessful in placing before the jury evidence sufficient to fairly generate the issue of mitigation by hot-blooded response to adequate provocation.

(Emphasis supplied). *See also State v. Martin,* 329 Md. 351, 358, 619 A.2d 992 (1993); *Simmons v. State,* 313 Md. 33, 39–40, 542 A.2d 1258 (1988).

■ With respect to perfect self-defense, that burden would be one of producing a *prima facie* case with respect to each and every one of the four (or five) required elements of the defense. A failure to establish a *prima facie* case with respect to any one of the requirements would be fatal to the entire defense. With respect to imperfect self-defense, the appellant enjoys a reduced burden of production with respect to two of the requirements but still faces the burden of establishing a *prima facie* case in all other regards. In *Cunningham v. State,* 58 Md.App. at 257, 473 A.2d 40, we held unequivocally that a reduced burden of production as to one or two elements of the defense does not by any means relieve a defendant of the full burden of production with respect to all other elements:

> In the present case, it is clear that the appellant did not meet his burden of production to generate a genuine jury issue as to imperfect self-defense. *Even crediting his strained and implausible assertion as to his thought pro-*

*cess was enough to generate an honest, though unreasonable, belief that he was in deadly peril, all of the testimony establishes unequivocally that the appellant was the aggressor and there was no shred of evidence to indicate otherwise.* The very notion that, failing to establish a perfect component of a defense for purposes of total exculpation, the lesser establishment of that component in imperfect form may nonetheless argue for mitigation, is a notion that presupposes the establishment of all of the other elements that are necessary to comprise the defense. *If a defense requires proof of A, B, and C, proving half of C for mitigation rather than all of C for exculpation, still presupposes the proof of A and B. Absent proof of A and B, whatever happens to C, in whole or in part, is utterly immaterial.* Although as a lesser defense, *the partial proof of an element* may still stand as a pale reflection of the fuller proof of that element, it *can never forgive the total failure of proof as to other necessary elements.* The appellant here would have his partial proof of one component of self-defense divert attention from his utter failure to produce even a *prima facie* case as to the other necessary element.

(Emphasis supplied). There is a diversionary danger here that must be scrupulously avoided.

This is the psychological key to why this increasingly popular contention has appeared to be more perplexing than it should be. *Fixating on the defensive element that fails of proof only partially, we tend subconsciously to overlook other defensive elements that fail of proof totally, which failures would, if noticed, be dispositive.*

*Id.* (emphasis supplied). In terms of the appellant's burden of production, each element of the defense of self-defense, perfect or imperfect, must be independently established.

Although with this theory of mitigation (as, indeed, with all theories of mitigation, including the Rule of Provocation), the burden of production is unquestionably cast on the defense to generate a *prima facie* case in order to be entitled to a jury

instruction, this allocation of the burden by no means suggests that the source of the evidence must be the testimony of the defendant himself. It may, of course, be the defendant's testimony, as it frequently is. The *prima facie* case may also, however, be established, in whole or in part, by the testimony of other defense witnesses or by other evidence in the case. The source of the *prima facie* case, moreover, will sometimes be evidence brought out by witnesses for the State, developed on cross-examination or even gratuitously offered on direct examination. The possible sources for the defense's *prima facie* case are open-ended.

■ In discussing the establishment of a *prima facie* case of self-defense in *Dykes v. State,* 319 Md. 206, 217, 571 A.2d 1251 (1990), Judge Orth explained:

> The source of the evidence is immaterial ... If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden.

In *Criminal Homicide Law, supra,* § 9.4, p. 167, what was said with respect to the Rule of Provocation would apply with equal force to imperfect self-defense or to any theory of mitigation:

> There is no requirement that a defendant must take the stand and testify in order to generate a theory of mitigation based on provocation. Evidence of that may be produced by other defense witnesses or by State's witnesses. As a practical matter, however, it is frequently only the defendant who can testify as to his own state of mind at the time of the killing.

As a practical matter, when dealing with the subjective state of mind of the defendant, he will be more often than not the best source of such information. Theoretically, however, such information could be produced from other sources. With respect to objectively measured elements, by contrast, the source of information can obviously be far more broad ranging.

## The Indispensability of Non–Aggressor Status

In analyzing one by one the elements necessary to generate a *prima facie* case of imperfect self-defense, the appropriate one with which to begin in this case, in keeping with the chronology of unfolding events, is the requirement that the defendant shall not have been the aggressor. This is an objectively measured element that is common to perfect self-defense and imperfect self-defense alike. There is no watered-down version or partial satisfaction of this particular requirement. In *Thornton v. State,* 162 Md.App. 719, 876 A.2d 142 (2005), Judge (now Chief Judge) Krauser wrote for this Court in affirming the decision of the trial judge not to instruct the jury on the issue of imperfect self-defense in a case in which the trial judge had ruled, *inter alia,* that the defendant "was the aggressor in the confrontation between [the victim] and himself." 162 Md.App. at 733, 876 A.2d 142. We spelled out the pertinent element with respect to which the appellant had failed to produce a *prima facie* case:

> In Maryland, the elements for perfect self-defense are:
>
> . . . .
>
> (3) *The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict;* . . . .

*Id.* (emphasis supplied).

After referring to two other elements of the defense with respect to which there is a difference between the perfect and imperfect versions, this Court made it clear that "[i]n all other respects, the elements of the two doctrines are the same." 162 Md.App. at 734, 876 A.2d 142. Judge Krauser explained:

> An aggressor is not entitled to a self-defense instruction *if he initiated a deadly confrontation* or escalated an existing confrontation to that level.

*Id.* (emphasis supplied). With respect to the failure of the defendant to generate a genuine jury issue as to his non-aggressor status, our holding, 162 Md.App. at 734–35, 876 A.2d 142, was clear:

> The circuit court . . . found that *appellant was the aggressor.* . . . In rejecting appellant's claim for imperfect self-

defense, the circuit court stated, among other things, that appellant acted with "malice" because *appellant "was the one that ... stirred the pot and stood his ground when the challenge was accepted* by the victim."

We need not rehash once more the facts surrounding the stabbing. Suffice it to say that *when the victim approached, it was,* as the trial court noted, *at appellant's invitation.* ... Consequently, *the circuit court did not err in rejecting appellant's imperfect self-defense claim,* and thereafter convicting him of second degree murder. Having concluded that the circuit court could have reasonably found that appellant was an aggressor in the fight ... we need not address appellant's other contentions concerning imperfect self-defense.

(Emphasis supplied). *State v. Martin,* 329 Md. 351, 360, 619 A.2d 992 (1993) ("[T]he defendant must also produce some evidence that he was not the aggressor."); *Lambert v. State,* 70 Md.App. 83, 97, 519 A.2d 1340 (1987) ("One who is the aggressor in an encounter ... is not entitled to invoke the imperfect self-defense doctrine, even though he honestly (but unreasonably) believed that he was required to use the level of force employed in order to defend himself."); *Cunningham v. State,* 58 Md.App. at 256, 473 A.2d 40 ("An aggressor, faced even with the reasonable belief in the necessity to kill, cannot have the defense of self-defense, for that requires ... freedom from fault in the inception of the difficulty.").

With respect to the final lethal confrontation when the appellant put four bullets into Brian Adams, Judge Bernhardt ruled that the appellant was indisputably the aggressor who brought on that final confrontation. The earlier confrontation at the Crown Station had come to an end. The appellant had stated, "I don't want no beef," had taken his cigarettes, and had walked away toward his grandmother's house. Brian Adams and his "homeboys" walked away in a different direction, down Twin River Road toward their stalled vehicle, which they were going to resupply with gasoline and then drive away. The appellant, in the meantime, had gained the safe haven of his grandmother's house. The earlier troubles

were over. But for the appellant's sense of wounded pride or threatened manhood, those troubles would have faded into forgettable insignificance.

That was not to be. Hastily changing clothes (the purpose for which was never quite clear), the appellant wasted no time in getting back on the street to renew the encounter with Adams and the "homeboys." A few extra minutes at home would have allowed Adams and company to have cleared the area, presumably forever since it was not their neighborhood. In going out again immediately, the appellant clearly anticipated meeting the group again because he first called his cousin, Chris, to serve as his "backup." The need for a "backup" implies a likely confrontation. The appellant, indeed, explained that his need for a "backup" was because he had been "kind of intimidated" by the encounter at the Crown Station. When his cousin did not answer the phone, the appellant went to the kitchen and, as an alternative, took a steak knife "for backup." He explained that the steak knife would not have been necessary if his cousin had been available for "backup." The appellant was unquestionably arming himself for trouble as he deliberately chose to go in harm's way. In his testimony, he explained why he approached Adams and his "homeboys":

Q. You went right to those three guys?

A. Yes, ma'am.

Q. 'Cause you wanted to confront them?

A. Yes, ma'am.

As Judge Kenney noted in *Marquardt v. State*, 164 Md.App. 95, 141, 882 A.2d 900 (2005):

We acknowledge that the privilege of self-defense is not necessarily forfeited by *arming one's self in anticipation of an attack*, but that right is qualified by the proviso that *the right only extends to "one who [was] not in any sense seeking an encounter."*

(Emphasis supplied). *See also Perry v. State,* 234 Md. 48, 52, 197 A.2d 833 (1964); *Marr v. State,* 134 Md.App. 152, 183, 759 A.2d 327 (2000).

His haste in getting back on the street and his felt need for "backup" make it impossible for the appellant to pretend that he was "not in any sense seeking an encounter." In his trial testimony, the appellant testified that, as he returned to the scene of the earlier confrontation, he "thought I would see 'em again." He acknowledged that he could have avoided the encounter but explained that that was not his style:

> *I wasn't thinking about avoiding it.* Honestly, because, what I'm saying, I felt like *I gotta be in this area and I'm going to see them again,* know what I'm saying. And *I'm not the type that run,* you know what I mean, so *I just figured whatever was gonna happen it might as well happen now.*

(Emphasis supplied). *Que sera, sera.*

The appellant then spotted Adams and his two companions down Twin Rivers Road and moved in that direction. When they, in turn, spotted him, they "threw their hands up," which the appellant interpreted to mean that they wanted to fight. They, however, did not approach him. He, fully aware that they wanted to fight, approached them. As the approach ended, the appellant and Adams were staring each other down, face to face and only several feet apart. The appellant testified that he was, at that point, "ready to fight."

With absolutely everything the appellant said and did pointing indisputably in one windward direction, he cannot now claim the protection of the lee shore by claiming that his initiation of the renewed encounter was not with the intention "to start something" but was only with the counter "intention to squash it." It may take only slight evidence to generate a jury issue, but slight evidence must still be somewhat more than preposterous. A nonbeliever might declare, "The earth is flat" or Joseph Goebbels might declare, "The 1939 invasion of Poland was for the purpose of preserving the peace," but every inane statement does not *ipso facto* satisfy the burden of

production. Simply to assert that the moon is made of green cheese does not generate a genuine jury issue in that regard. The image of the armed and advancing appellant as a peace-maker is in the same category.[4]

One other observation is important. Although the appellant's arming himself with a deadly weapon could well give rise to the conclusion that he was an aggressor at the deadly level from the outset, such a conclusion is not indispensable to our analysis. Even if the degree of the appellant's aggression escalated from the non-deadly level to the deadly level while en route to the fatal encounter, what matters is that it was at the deadly level as of the time he closed the final gap and stood toe-to-toe with Adams. Each had a discernible bulge in his pants pocket. Each had a hand on his pocket, ready to draw. Each challenged the other with, "What do you have in your pocket?" Each knew full well that the answer was a deadly weapon of some sort. As the appellant took the final

---

**4.** In *State v. Marr*, 362 Md. 467, 470–71, 765 A.2d 645 (2001), the defendant, unsuccessfully, made a similar claim that he was not the aggressor when he went looking for two men who he believed had been responsible for killing his cousin days earlier:

Marr later went looking for Carroll and Jackson, allegedly to inquire about their involvement in the killing of Muse. . . .

. . . *[H]e claimed* that he was both enraged and terrified when he learned about the earlier episode and *that he went to see Carroll "to see what his feelings were and to see if things could be resolved, and if he would confess to the murder of my cousin."* He and Alston were armed, he said, "for our protection."

(Emphasis supplied). In *Cunningham v. State*, 58 Md.App. at 254, 473 A.2d 40, the defendant had brought on the fatal confrontation under the following circumstances:

*The appellant,* resentful and *angry over having had his Moped taken* from him earlier in the day by the ultimate homicide victim, *rallied his supporters* over a period of several hours, *armed himself with a loaded gun, gathered his courage at his grandmother's house* while testing the gun, *and ultimately went looking for the victim.*

(Emphasis supplied). This Court made it clear that such an aggressor is debarred from asserting either perfect or imperfect self-defense: An aggressor, faced even with the reasonable belief in the necessity to kill, "cannot have *the defense of self-defense,* for that *requires . . . freedom from fault in the inception of the difficulty."*

58 Md.App. at 256, 473 A.2d 40 (emphasis supplied).

steps to bring on this encounter, the encounter was indisputably at the deadly level.

Judge Bernhardt found that, among the reasons the appellant did not qualify for an instruction on imperfect self-defense, the appellant was unquestionably the aggressor who brought on the lethal encounter.

> Mr. Wilson's response to that was to go home and at that moment he was very deliberative, *he thought through what he intended to do. First he called for his cousin for backup, which suggests to me that Mr. Wilson was looking to take care of business immediately,* because you can't walk around with your cousin for the rest of your life. And that's true because *Mr. Wilson said he's not the kind to run, he's gonna take care of it.* He put on—he changed his clothes, he changed his clothes for, quite frankly, competing reasons, one was to, maybe, not be identified by the three boys, but the other was not to be identified by other persons, should he be involved in an altercation. So, again, *he was thinking beyond personal safety,* he was thinking at that point [of] lack of detection. And *he armed himself with a knife as backup,* since he couldn't find his cousin and then, according to his testimony, *he proceeded to want to walk towards Oakland Mills.* And he left, clearly, very shortly—left his home, clearly, very shortly after he arrived. *He certainly didn't wait to give the three a chance to vacate the area.* So *he was certainly, aware of the probability or possibility at least, that he would see these boys again, which is why he armed himself.* When he saw the boys there was, according to the testimony, a gesturing by Bryan Adams, a raising of the hands in the air.
>
> . . . .
>
> *. . . [I]t was his view that the raising of the hands was an invitation to fight and he crossed a road to go towards Mr. Adams.*

(Emphasis supplied). We cannot say that that ruling was legally incorrect.

## Objectively Reasonable Apprehension
## Of Harm to Life or Limb

Whether the circumstances, objectively measured as of the moment the appellant fired the fatal shots, would have generated an apprehension in the so-called "reasonable man" that he was in immediate danger of death or serious bodily harm is beside the point. Judge Bernhardt did not believe that the circumstances were enough to generate any such reasonable apprehension, and that is why he declined to instruct the jury on perfect self-defense. Coincidentally, we fully agree with him. It is, however, a superfluous element on the distinct subject of imperfect self-defense.

 To qualify for the defense of imperfect self-defense, a defendant need only have entertained a genuine subjective apprehension that he was faced with an immediate threat of death or serious bodily harm. Even if such an apprehension would have been unreasonable but the defendant nonetheless subjectively felt it, the mitigating defense of imperfect self-defense would still be available. Even if, moreover, the circumstances were such that the fear of death or serious bodily harm would have been eminently reasonable but the defendant himself did not subjectively feel such an apprehension, the defendant would not be entitled to the defense of imperfect self-defense. Thus, for perfect self-defense, the apprehension must be both objectively reasonable and subjectively actually present. A subjectively genuine apprehension is a *sine qua non* of both perfect and imperfect self-defense.

## Subjectively Genuine Apprehension
## Of Harm to Life or Limb

Judge Bernhardt ruled that the appellant had not satisfied his burden of production on the issue of a genuine fear on his part that, as of the moment he pulled the trigger, he was in immediate danger of death or serious bodily injury.

It was the appellant who followed Adams and his friends as they walked toward their car. It was the appellant who, after concluding that the three were ready and willing to fight,

deliberately closed the distance between them. It was the appellant who walked up until he and Adams stood *mano-a-mano* a few feet apart in a classic Western face-down. The two "homeboys" were standing several feet back. Adams had his hand on the gun in his pocket. The appellant had his hand on the knife in his pocket. Adams asked the appellant what he had in his pocket. The appellant asked Adams what he had in his pocket. The appellant testified that they went "back and forth" like that. Adams then pulled out his gun, looked at the appellant, and "smiled." The appellant, remarkably, "grabbed" for the gun and wrenched it away from Adams. The scene then froze as the appellant stood there holding the gun on Adams. The appellant testified that the homeboys "stood off" a few feet behind Adams "kind of scared, like they didn't know what was up."

In terms of the duration of the then critical moment of decision, the appellant testified that, after grabbing the gun from Adams, he held it in his hand and paused, explaining that "it wasn't a whole minute, *but I did wait*" before deciding to pull the trigger and shoot Adams. (Emphasis supplied). On redirect examination, the appellant described that frozen moment in time as "no more than maybe, like, 15 seconds." As Judge (now Chief Judge) Bell made clear in *State v. Martin*, 329 Md. 351, 364, 619 A.2d 992 (1993), the critical issue is that of what the appellant "subjectively believed or felt *when he fired the fatal shot.*" (Emphasis supplied). In *Sims v. State*, 319 Md. at 553, 573 A.2d 1317, Judge McAuliffe also pointed to the precise moment when the state of mind of the gunman is of critical significance, "[T]here is not a shred of evidence showing the state of mind of the defendant *at the moment of the shooting.*" (Emphasis supplied).

The appellant testified as to what was going through his head during that critical moment of decision. He testified that he "was scared, *I was mad,* you know what I'm saying, *I felt challenged,* you know what I'm saying. I had a lot of emotion running through my head at that time." (Emphasis supplied). The appellant claimed that Adams twice challenged him to shoot the gun. In response, the appellant "pointed it

to him. I point it to him, you know what I mean, I was kind of shaking, you know what I'm saying. He was just, like, you got it now, shoot." The appellant then shot Adams four times. After the second shot, Adams fell to the ground. The appellant then shot him two additional times as he lay on the ground.

■■■■■ When asked why he shot Adams four times, the appellant explained that he "was just caught in the moment." The words were not those of someone desperately trying to save his own life.

Honestly, my finger was just on the trigger, you know what I'm saying. Like, *I can't really explain*, like, what was going through my mind, 'cause like I said, *it wasn't no thought* in it, you know what I mean. It was just, like, just go, you know what I mean, *I can't really explain it.*

(Emphasis supplied). When asked specifically what "emotion" he was feeling, the appellant replied, "anger, really anger. I was scared,[5] I was angry, all the same emotions I had when he pulled it on me." To meet the burden of production with respect to the apprehension of imminent death or serious bodily harm, a mere turbulent mish-mash of emotions will not suffice. In *Lambert v. State*, 70 Md.App. 83, 98, 519 A.2d 1340 (1987), Judge Bloom explained for this Court:

*He did not state he felt it necessary to stab the victim to defend himself.* The evidence leads to the conclusion that *appellant subjectively experienced various emotions* during the fight, but fear was not one of them. Moreover, *appellant's repeated assertions that his mind was a "blank"*

---

**5.** Being "scared" does not satisfy the burden of production. As *State v. Martin*, 329 Md. at 365 n. 6, 619 A.2d 992, pointed out, undifferentiated fear will not suffice. It must be more specifically confined to the necessary mental state that will trigger the defense:

It is doubtful that fear alone suffices to generate the requisite state of mind for imperfect self-defense. The fear must be of imminent death or serious bodily injury.

*during the incident are inconsistent with and belie a fear-
ful state of mind.*

(Emphasis supplied).

In his earlier statement to the police, which was taped and
played for the jury, the appellant had also described the
critical moment as he held the gun on Adams:

> *I pulled it at him. He was like, shoot. I stood there for
> a minute, man. He like, shoot. Okay, shoot. So I shot.
> Shot four time.* Dropped the pistol. I took out. Got out of
> Dodge. My intentions, my, wasn't on killing this man. I'm
> no killer. I'm not no murderer. That's not my [style].
> That's not how I get down. I done been in a couple fights.
> I done been out there in the streets for a minute. And, and
> I, and *I done did what I done did.* But that wasn't my
> intentions. Really. I aint even want to fight. And I'm
> saying it all happened so fast, man. *Me trying to boost
> myself up,* like, man, forget it, man. Aint nothing, aint
> nothing, aint nothing. Know what I'm saying? And it just
> happened real fast, man. And his dudes, you know what
> I'm saying? His, they kept talking slick, man. Like that
> was, like they was bears or something. You know what I'm
> saying? I tried to tell them, I'm, I aint from around here
> man. You know what I'm saying?

(Emphasis supplied).

In declining to instruct the jury on imperfect self-defense,
Judge Bernhardt pointed out that the appellant, who bore the
burden of production, never testified that at the critical mo-
ment of decision, as he was holding a gun on the unarmed
Adams and was in complete control of the scene, he was acting
out of fear of imminent death or serious bodily harm.

> And according to his testimony he put his hand in his
> pocket where the knife was. And Mr. Adams, according to
> him, had his hands in his pockets, so they both were looking
> at each other with their hands in their pockets. And *there's
> a lot of thinking going on here, a lot of decision making
> going on here, none of which smacks nor is there any
> evidence that there's fear of death or imminent bodily harm*

*coming, so that's [him] protecting himself.* In fact, he's going towards the source of the fear of death and imminent bodily harm, if that's what was present at this point.... *[W]hen Mr. Adams is looking at one of his friends the Defendant disarms him and he holds the gun for upwards of—for a period of whatever, but 15 seconds is the number that was testified to, before firing the shots four times. During that time period,* when asked about his state of mind, and *that's the operable time period,* really, for this, when asked about his state of mind, he expressed that he was caught up in the moment. *There's no specific articulation of fear of death or serious imminent bodily harm, there's no specific articulation of observations that prompted his fear, at that moment. He has the upper hand, he has control of the situation, he's,* by all accounts, *at that moment in time, not confronted by a weapon. There's no articulation of any behavior by Brian Adams,* during that moment in time, that would—*that could be pointed to as a source that would cause fear of imminent death or of death or serious bodily harm.*

(Emphasis supplied).

The appellant did not, in the words of *Bruce v. State,* 218 Md. 87, 97, 145 A.2d 428 (1958), establish a *prima facie* case that he "believed at the time he was in such immediate danger of losing his own life or suffering serious bodily harm as made it necessary to take the life of the deceased to save himself." What the appellant may have felt at the Crown Station perhaps five minutes earlier or even when Adams pulled a gun perhaps two minutes earlier is not the critical state of mind. As the Court of Appeals noted in *State v. Martin,* 329 Md. at 365, 619 A.2d 992:

*Evidence that a defendant may have been afraid of a victim at an earlier time,* assuming that is the relevant subjective belief, *does not mean that, at the moment of the fatal encounter, that state of mind persisted, especially when,* as here, *the defendant returned to the site of the encounter after apparently arming himself. Since it is the defendant's subjective belief at the moment that the fatal*

*shot is fired that is relevant* and probative, *evidence of a prior mental state will not suffice.*

(Emphasis supplied).

Judge Bernhardt was not in error. In yet a second respect, the appellant failed to qualify for an instruction on imperfect self-defense. There was no evidence as to this element of the defense, either from the testimony of the appellant or from any other source.

## Subjective Belief That the Force Used Was Not Excessive

The force used by the appellant in ostensible self-defense was the firing of four bullets into the body of Adams. For perfect self-defense, the issue would have been whether, objectively measured, it would have appeared to the reasonable man that such a degree of force was necessary to save him from death or serious bodily harm and was, thus, non-excessive. As noted above, Judge Bernhardt ruled that this was not the case and denied the requested jury instruction on perfect self-defense. The appellant has not appealed that ruling.

To qualify for an instruction on imperfect self-defense, on the other hand, it would only be necessary that the appellant should have entertained a genuine subjective belief that such a degree of force was necessary, quite regardless of whether objectively it was or was not. The subject matter of the subjective belief, it must be carefully noted, is not the use of force *per se,* but of the **degree of force** that was necessary. If the force employed was more than was necessary, it was by definition excessive.

The appellant offered not a shred of testimony as to whether he thought it necessary for his own protection to kill Adams or, if he thought it was, why he thought so. No such evidence, moreover, was produced by any other witness offered by the defense or by the State. The appellant offered no explanation as to why, while holding a gun on unarmed men, he could not have ordered them at gunpoint to turn and walk away. He offered no explanation as to why he himself could not have

walked away, backing away cautiously if need be in order to keep his eye on the threesome. If the appellant thought the use of the gun was somehow necessary, moreover, he offered no insight into why he thought that shooting Adams four times was not excessive, if done exclusively for self-protection. The appellant did not reveal why seriously wounding Adams with a single bullet into his arm or shoulder or disabling Adams with a single bullet to the leg or knee or foot would not have been sufficient for self-protection. The appellant offered no thought as to why, as Adams lay on the ground after the first two shots, the third and fourth shots were not excessive but were deemed by him to have been necessary.

In brief, the appellant argues fervently that the evidence permits an inference that the appellant may well have believed that the use of force was necessary to defend himself even if he did not expressly say so. In response to just such an argument, *Lambert v. State,* 70 Md.App. at 99, 519 A.2d 1340, replied:

> While someone in appellant's position might have entertained an honest but unreasonable belief that he needed to use deadly force to defend himself, *the evidence furnishes no indication that appellant did, in fact, so believe.*

(Emphasis supplied).

We hold that the instruction on imperfect self-defense was properly denied on this basis alone. The appellant did not meet his burden of production with respect to having a subjective belief that the amount of force he used was necessary to save him from death or serious bodily harm.

### The Duty to Retreat

■ The elements of self-defense, both perfect and imperfect, do to a limited extent overlap or blend into one another at least at the edges. In a sense, an awareness of an avenue of possible retreat could influence a defendant's apprehension of the imminence of the threat to life or limb or could influence a defendant's belief in the degree of force, if any, necessary for self-preservation. The duty to retreat could

thus be treated as a contingent factor sometimes having a bearing on either or both of two other requirements. On the other hand, the duty to retreat has enough special features to qualify as an independent fifth element for self-defense analysis. We will so treat it.

Although allusively mentioned in *Bruce v. State,* 218 Md. at 97, 145 A.2d 428, and distinguished in *Gainer v. State,* 40 Md.App. 382, 386–89, 391 A.2d 856, *cert. denied,* 284 Md. 743 (1978), the duty to retreat before using force in self-defense was first fully analyzed by Judge Wilner for this Court in *Barton v. State,* 46 Md.App. 616, 618, 420 A.2d 1009 (1980):

> One aspect of that law is the duty that one has "to retreat or avoid danger if such means [are] within his power and consistent with his safety" and, ordinarily, *to invoke the defense successfully, the defendant must show that it was not possible to retreat safely,* either at all or any farther than he had.

(Emphasis supplied). *See also Burch v. State,* 346 Md. 253, 283, 696 A.2d 443 (1997) ("One of the elements of the defense of self-defense is the duty of the defendant to retreat or avoid danger if such means were within his power and consistent with his safety."); *Lambert v. State,* 70 Md.App. 83, 92, 519 A.2d 1340 (1987) ("[I]t is the duty of the defendant, when defending himself outside the home, to retreat or avoid the danger if the means to do so are within his power and consistent with his safety."); *Corbin v. State,* 94 Md.App. 21, 25, 614 A.2d 1329 (1992) ("Under ordinary circumstances . . . the accused must make all reasonable efforts to retreat before resorting to the use of deadly force."); *Redcross v. State,* 121 Md.App. 320, 328, 708 A.2d 1154 (1998) ("In cases in which self-defense is claimed, the accused normally has a duty to retreat. In other words, except in limited circumstances, the accused must make all reasonable efforts to withdraw from the encounter before resorting to the use of deadly force."); *Thornton v. State,* 162 Md.App. 719, 734, 876 A.2d 142 (2005) ("[T]o be entitled to a self-defense instruction, an accused has a duty to retreat or avoid danger if such means [are] within his power and consistent with his safety.").

Despite the legal and moral obligation to do so, the appellant most definitely did not retreat. He stood his ground like Will Kane at "High Noon" and blasted away. As the only armed man on the scene, his available avenues of retreat boxed the compass. The only thing blocking the appellant's retreat was his own testosterone-driven Code of Bushido that "real men don't walk away from a fight." Such Samurai machismo, however, has been flatly repudiated by the law of Maryland which commands that even "real men" must walk away from a fight—whenever they can and even if they have been "disrespected." We have not had the Code Duello for two hundred years and are not about to resurrect it.

Neither the appellant nor any other witness revealed anything about any inner thoughts he may have entertained on the efficacy of retreat. If he thought that no avenue of retreat was available, he never said so. If he thought that retreat was unsafe under the circumstances, he never said so. His, of course, was the burden of production in that regard. In ruling on the imperfect self-defense instruction, Judge Bernhardt gave us the benefit of his conclusion on the duty to retreat:

> He—*after having removed the threat of deadly force from Mr. Adams, he didn't retreat, there's been no testimony that he was incapable of retreating.* The only testimony as it relates to the other two fellas was, that they were frozen and watching, as opposed to taking up positions to block any route of escape.

(Emphasis supplied).

### Conclusion As To Imperfect Self–Defense

In four separate regards, the appellant failed to generate a *prima facie* case of imperfect self-defense. Any one of those failures, standing alone, would cause us to affirm the decision of Judge Bernhardt not to instruct the jury on that issue. We, therefore, affirm.

### Hot–Blooded Response to Legally Adequate Provocation

■ In a secondary attempt at mitigation, the appellant requested a jury instruction on hot-blooded response to legally adequate provocation. That is the classic paradigm for a finding of voluntary manslaughter. The so-called Rule of Provocation, though for centuries an integral part of Anglo–American common law, was first recognized by the Court of Appeals in *Davis v. State*, 204 Md. 44, 102 A.2d 816 (1954). The defendant there had argued that he was resisting an unlawful arrest when he fired several shots, one of which killed an officer. Judge Hammond concluded for the Court, *id.* at 54, 102 A.2d 816:

> These cases apply a subjective standard and hold that *the accused must in fact have been filled with passion aroused by the illegal arrest* sufficient to meet the usual provocation tests, if murder is to be reduced to manslaughter. The *courts following this line usually classify illegal arrest with sudden combat, assault and battery upon one's person, and the sight of one's wife in the act of adultery, as the standard situations in which a homicide arising out of the agitation stirred up in ordinary men by them will be manslaughter, rather than murder.*

(Emphasis supplied).

■ The seminal examination of this theory of mitigation was subsequently made by this Court, speaking through Judge Orth, in *Whitehead v. State*, 9 Md.App. 7, 10, 262 A.2d 316 (1970):

> For the "Rule of Provocation" to be invoked there are four requirements:
>
> (1) There must have been adequate provocation;
>
> (2) The killing must have been in the heat of passion;
>
> (3) It must have been a sudden heat of passion—that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;

(4) There must have been a causal connection between the provocation, the passion, and the fatal act.

## The Burden of Production Is On the Appellant

■ With the Rule of Provocation as with the imperfect defenses, the burden of production is on the defendant to generate a *prima facie* case with respect to each and every one of the four elements of the defense. Should any one of the four be lacking, mitigation based on the Rule of Provocation will not be an issue for the jury to consider. This Court described the rigorous nature of the requirement in *Tripp v. State*, 36 Md.App. 459, 477, 374 A.2d 384 (1977):

> *Each of the four elements is a sine qua non for a defense of mitigation* based upon hot-blooded response to legally adequate provocation. The evidence was palpably insufficient with respect to at least three of the elements, all of which would be necessary to generate a genuine jury issue.

(Emphasis supplied). *See also Lang v. State*, 6 Md.App. 128, 131, 250 A.2d 276 (1969); *Cunningham v. State*, 58 Md.App. 249, 258, 473 A.2d 40, *cert. denied*, 300 Md. 316, 477 A.2d 1195 (1984) ("The appellant had failed to establish a *prima facie* case of hot-blooded provocation with respect to at least two of the necessary four elements. Either failure would be fatal to his theory of mitigation."); *Scott v. State*, 64 Md.App. 311, 323, 494 A.2d 992, *cert. denied*, 304 Md. 300, 498 A.2d 1186 (1985) ("Failure to prove any one of the necessary four elements is fatal to establishing a theory of hot-blooded provocation."); *Price v. State*, 82 Md.App. 210, 218, 570 A.2d 887 (1990).

■ To avoid any possible confusion, we repeat briefly what we earlier said in greater detail about the burden of production in cases of imperfect self-defense. Although the burden of production is on the appellant, the appellant himself need not testify in order to satisfy that burden of production. Any evidence in this case, whether emanating from the appellant or the appellant's witnesses or the State's witnesses or from any source, can satisfy the burden of production.

## Acting in the Heat of Passion

The first of the four elements of the defense is that the defendant actually acted in the heat of passion. The appellant here never testified that, as he shot Adams four times, he was acting in hot-blooded rage brought on by the act of Adams in pulling a gun from his pocket and smiling. Although the appellant, on several occasions, described one of his overlapping emotions as that of being "angry," every indication is that his anger stemmed from having been insulted and "disrespected" back at the Crown Station rather than from any action by Adams at the homicide scene. Whatever anger or retaliatory motive impelled the appellant to initiate the ultimately deadly confrontation was already driving him forward as he made his hasty turnaround at his grandmother's house, sought his cousin to serve as his "backup," armed himself with a knife, and then set out in search of Adams and his companions. His testimony that he had armed himself because he "thought I would see 'em again," that he "went right to those three guys ... 'cause [he] wanted to confront them;" that he is "not the type that run," that he "just figured whatever was gonna happen 'it might as well happen now,'" and that he "was ready to fight" clearly locate the onset of his anger at a time well before he and Adams stood toe to toe. He hardly mentions Adams's drawing of the gun from his pocket and never so much as suggests that it, and not the prior insult at the Crown Station, was the catalytic event that precipitated a sudden surge of hot-blooded rage.

We will turn to the legal significance of the insult at the Crown Station in a moment. For the nonce, we are making the point that the appellant never really actually described a sense of hot-blooded rage, let alone attributed such a sense of overpowering rage to the actions of Adams at the crime scene. No one else, moreover, testified as to such a sense of rage on his part. This element of the defense, the actual state of rage in the mind of the defendant, is a subjective requirement. It would not be enough that some legally adequate provocation had occurred. It would not be enough that, objectively speaking, the circumstances could have created hot-blooded rage in

an average or reasonable person. It must affirmatively be established that the defendant himself was actually acting in hot blood. *Sims v. State,* 319 Md. 540, 553, 573 A.2d 1317 (1990) ("The blood must indeed be hot, and under some circumstances only the hot-blooded killer can attest to that."); *Conway v. State,* 94 Md.App. 436, 443, 617 A.2d 1130 (1993); *Price v. State,* 82 Md.App. 210, 218, 570 A.2d 887, *cert. denied,* 320 Md. 16, 575 A.2d 742 (1990); *Carter v. State,* 66 Md.App. 567, 573, 505 A.2d 545 (1986); *Tripp v. State,* 36 Md.App. 459, 469, 374 A.2d 384 (1977); *Bartram v. State,* 33 Md.App. 115, 175, 364 A.2d 1119, *aff'd,* 280 Md. 616, 374 A.2d 1144 (1977). In this regard alone, the issue of hot-blooded response to provocation was not generated.

### A Cooling Period

If the precipitating cause of the appellant's later behavior was, as it clearly appears to have been, the earlier confrontation at the Crown Station, that would raise the further question of whether there had been a reasonable opportunity for the passion to cool between that confrontation and the ultimate shooting. This is an element of the defense that in this case is to be measured objectively from the point of the "reasonable man." It is not here an element that is to be measured subjectively from the point of view of the defendant.

The cooling of the blood is a tricky analytic concept and must be handled delicately. It is a factor that appears in two of the paradigmatic criteria. It is to be subjectively measured in one of them but objectively measured in the other. When the issue is whether the defendant actually killed in hot-blooded rage (the first requirement), the presence and the continuation of hot blood is a subjective factor, as examined in *Criminal Homicide Law, supra,* § 9.7, "The Cooling Period," p. 172:

> That distinction is important to remember because the figure of speech about the *"cooling of blood" appears as a factor in the provocation equation on two separate occasions. The issue of whether the defendant's blood actually cooled is,* of course, *part of the subjective component of*

*whether he acted in the heat of passion.* That component, by definition, embraces both the generation of hot blood in the first instance and then the continuation of that heated state until the moment of killing in the second instance. *If, albeit initially enraged, the defendant's blood actually cooled before he committed the criminal act, then that defendant is bereft of the benefit of provocation even if the time for cooling was, objectively speaking, so brief that the average person's blood would not have cooled. That purely subjective cooling or non-cooling* of the defendant's blood, however, *has nothing to do with the very different objective component of provocation now being analyzed. This component is concerned with the hypothetical temperature of the average person's blood, not the actual temperature of the defendant's blood.*

(Emphasis supplied).

When we turn, by contrast, to the distinct and autonomous criterion of whether enough time had elapsed for the hypothetical reasonable man's blood to have cooled, that specimen of "coolness" is placed under an objective microscope. With respect to the nature of the measurement, *Tripp v. State,* 36 Md.App. at 470, 374 A.2d 384, was clear.

We are here concerned with *the objective test* of whether there had been *a sufficient cooling time for the passion of an average and reasonable man to abate.*

(Emphasis supplied). In *Carter v. State,* 66 Md.App. at 573, 505 A.2d 545, Judge Wilner reaffirmed the objective nature of this particular inquiry.

In the analysis of this element, we are concerned with *the objective test.*

(Emphasis supplied).

*Bartram v. State,* 33 Md.App. at 175, 364 A.2d 1119, also explained the objective nature of the test.

*By an objective standard,* moreover, the time frame must be close enough so that *an average and reasonable man*

*would not have had an adequate "cooling period" for the
first fury to abate.*

(Emphasis supplied).

*Dorsey v. State,* 29 Md.App. 97, 105, 349 A.2d 414, *aff'd,* 278
Md. 221, 362 A.2d 642 (1976), stressed once again the objective
nature of the test.

The more difficult problem, even in the limited terms of
finding a fair jury question, is in dealing with the additional
requirement that, *from the point of view of a reasonable
man, the passions would not have cooled.*

(Emphasis supplied).

In the *Tripp v. State* opinion, 36 Md.App. at 471–72, 374
A.2d 384, this Court articulated the rationale undergirding the
concept of a cooling period.

*The long-smoldering grudge ... may be psychologically
just as compelling a force as the sudden impulse* but it,
unlike the [sudden] impulse, is a telltale characteristic of
premeditation. The law extenuates certain killings not sim-
ply because they have been provoked but because there has
also been the lack of time between the provoking cause and
the impulsive response to think about the consequences or
the alternatives. *In the case of the spontaneous explosion,
reason has no opportunity to intervene; in the case of the
"slow burn," it has.*

(Emphasis supplied).

*Bartram v. State,* 33 Md.App. at 175–76, 364 A.2d 1119, also
examined the reasoning behind why the presence of a cooling
period would disqualify a defendant from resorting to this
particular theory of mitigation.

[I]n terms of the legal adequacy of the provocation, the
discovery of adultery must be sudden and unexpected. The
appellant here had been a regular eyewitness, an aider and
abettor (albeit a reluctant one) and indeed a bed partner to
the adultery on a weekly basis for the better part of several
years.

. . .

All of this is simply not what is contemplated by the law of mitigation when it looks to the hot blood or uncontrollable fury of a betrayed spouse suddenly catching a partner in an unanticipated act of infidelity.

*The law recognizes the human frailty of sudden fury.* For the long-suffering spouse, the way out of the unbearable predicament must be the divorce court and not a bullet.

(Emphasis supplied).

If we were, therefore, to take the insult the appellant suffered at the Crown Station as the spark for his subsequent anger, as his testimony unequivocally suggests we should do, we think the circumstances were such that the blood of an average and reasonable man would have cooled before the lethal encounter. The cooling period is measured not just by the ticking of the clock but by the intervening events, which in this case represented a clean break between the alleged cause and the alleged effect. The appellant was insulted. The appellant then walked to his grandmother's house. The appellant was completely out of contact with his tormentors as he entertained what *Tripp v. State* described as a "slow burn." There was a phase of deliberation as the appellant tried to call his cousin and then decided to arm himself with a knife. The appellant decided to leave the house and had some distance to walk in first locating and then catching up with Adams and the "homeboys." Objectively measured, this clean break in the chain of events would have had a cooling effect on the blood of the hypothetical reasonable man. The criterion of an objectively measured cooling period militates against resort to the Rule of Provocation in this case.

### The Legal Adequacy of Provocation

As the common law of manslaughter evolved over the course of 450 years, it cautiously and grudgingly created a very few sets of circumstances that might trigger the Rule of Provocation. What is required is not simply that an event be provocative in fact, but also that it fall into the small category of provocations that have received legal recognition. In *Dennis*

*v. State,* 105 Md.App. 687, 695, 661 A.2d 175, *cert. denied,* 340 Md. 500, 667 A.2d 341 (1995), Chief Judge Wilner for this Court noted the austerely limited scope of the defense.

> *[T]he provocation must be one the law is prepared to recognize* as minimally sufficient, in proper circumstances, to overcome the restraint normally expected from reasonable persons. *There are many "slings and arrows of outrageous fortune" that people either must tolerate or find an alternative way, other than homicide, to redress.*

(Emphasis supplied). *See also Tripp v. State,* 36 Md.App. at 473, 374 A.2d 384; *Girouard v. State,* 321 Md. 532, 542, 583 A.2d 718 (1991) ("[W]e agree with the Court of Special Appeals ... 'there must be not simply provocation in psychological fact, but one of certain fairly well-defined classes of provocation recognized as being adequate as a matter of law.'" (citing *Tripp v. State* )).

The Rule of Provocation was traditionally limited to four or five relatively narrow situations that were recognized as legally adequate provocation:

1. a mutual affray,

2. a response to a significant battery,

3. the sudden discovery of one's spouse in an act of adultery,

4. resistance to an unlawful arrest, and

5. a possible fifth variety of legally adequate provocation is a battery on a close relative. See *Girouard v. State,* 321 Md. at 538 [583 A.2d 718]; *Dorsey v. State,* 29 Md.App. 97, 104–05, 349 A.2d 414 (1975).

By Chapter 317 of the Acts of 1997, now codified as Maryland Code, Criminal Law Article, § 2–207(b), the sudden discovery of one's spouse in an act of adultery is no longer recognized as a legally adequate form of provocation to trigger the Rule of Provocation.[6]

---

6. *Criminal Homicide Law,* § 9.12, p. 182, explained the recent demise of this variety of legally adequate provocation.

In this case, there was clearly no battery on a relative of the appellant and the appellant was not subjected to an unlawful arrest.

## A Mutual Affray

 Nor was the allegedly provoking incident in this case a mutual affray, which, as Judge McAuliffe explained in *Sims v. State,* 319 Md. at 551–52, 573 A.2d 1317, means an actual fight in progress.

> Mutual combat has been recognized as a possible source of adequate provocation. The rule of provocation will apply when persons enter into angry and unlawful combat with a mutual intent to fight and, as a result of the effect of the combat, the passion of one of the participants is suddenly elevated to the point where he resorts to the use of deadly force to kill the other solely because of an impulsive response to the passion and without time to consider the consequences of his actions.

A mutual affray was the archetypical trigger for the Rule of Provocation and, as was explained in *Glenn v. State,* 68 Md.App. 379, 403, 511 A.2d 1110, *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986), grew out of what had earlier been described as chance medley or chaud medley. See *Whitehead v. State,* 9 Md.App. 7, 11, 262 A.2d 316 (1970); *Shuck v. State,* 29 Md.App. 33, 38–40, 349 A.2d 378 (1975); *Carter v. State,* 66 Md.App. 567, 571–72, 505 A.2d 545 (1986). Nothing that happened at the Crown Station constituted a mutual affray.

Had the appellant testified that he shot Adams in hot-blooded rage and that the trigger for his rage was staring at

---

In a high-profile case in Baltimore County in the mid–1990's, however, newspaper accounts of the trial and of comments made in the course of the trial caused this form of mitigation to fall into strong disrepute. It was not the legal principle itself that in any way offended; it was the public misperception of how the principle operated that triggered the strong public reaction. Although this variety of legally adequate provocation was, in theory at least, gender neutral, it was sensationally portrayed as creating "an open season on erring wives" for the benefit of male chauvinist husbands.

the barrel of a gun and then wrestling for the control of that gun, we would be facing a far more problematic issue. The Maryland caselaw is not helpful with a close analogy. Although the ancient concept of chaud medley more typically involved the rough-and-tumble combat of a "Pier Six brawl" or a "Donnybrook Fair," it would nonetheless seem that two men wrestling over the control of a gun could qualify as a mutual affray. In this case, however, the appellant has neither offered the fight for the gun as the catalyst for any hot-blooded rage on his part nor offered such hot-blooded rage as his reason for shooting his victim.

### Response to a Substantial Battery

█ The only variety of provocation that the appellant seems to be invoking in this case is response to a substantial battery. For the provocation to be deemed objectively adequate, a slight battery or merely offensive touching is not enough. The battery has to be significant enough in a physical sense that it might ignite the passion of and cloud the reason of a reasonable or average person. *Scott v. State,* 64 Md.App. 311, 323, 494 A.2d 992, *cert. denied,* 304 Md. 300, 498 A.2d 1186 (1985), made the point that neither bumping nor arguing will suffice.

> In the instant case, appellant failed to establish a theory of manslaughter based on hot-blooded provocation from the very beginning—*the requirement that there must have been adequate provocation.* Here, the evidence showed that *appellant bumped into the victim, the two argued, and then appellant turned and fired 4–6 shots* from his gun in the direction of the victim. We find that *appellant presented no evidence to generate a jury question on the issue of hot-blooded provocation.* The instruction appellant sought in this regard, therefore, was properly denied.

(Emphasis supplied).

### "Sticks and Stones May Break My Bones ..."

As examples of what might qualify as a substantial battery, in *Dorsey v. State,* 29 Md.App. at 103, 349 A.2d 414, we held

that a response to a significant battery would be established if the victim had thrown the defendant down the stairs. Moreland, *The Law of Homicide* (1952), points out at p. 76:

> While *a trivial blow is not sufficient,* a substantial battery upon the defendant or a close relative will justify the reduction of an intentional homicide to voluntary manslaughter. *A clout with a heavy hickory stick and a blow upon the back of the head with a pistol represent illustrations of the type of injury required.*

(Emphasis supplied).

Perkins, *Criminal Law* (2d ed.1969), p. 60, also describes what a *significant* battery might consist of:

> *Knocking a person down with a heavy stick, or hitting him over the head with a revolver, are rather obvious instances of such force;* but a weapon is not indispensable for this purpose. Thus *even a blow with the fist may be sufficient* to reduce an intentional killing to manslaughter, *particularly if it is a blow in the face or a "staggering" blow.*

(Emphasis supplied). Clark and Marshall, *Law of Crimes* (6th ed.1958), at p. 623, describes the type of significant battery that can stun or infuriate its victim:

> Every man, when *assailed with violence or great rudeness,* is inspired with a sudden impulse of anger, which puts him upon resistance before time for cool reflection; and if, during that period, he attacks his assailant with a deadly weapon, even with intent to kill, and death ensues, it is regarded as done through heat of blood, and, unless malice is shown by the circumstances, the killing is only manslaughter. *To reduce the killing to manslaughter, the assault must have been with violence or great rudeness,* and must have been reasonably calculated to excite passion and heat of blood.

(Emphasis supplied).

In *McKay v. State,* 90 Md.App. 204, 207, 600 A.2d 904 (1992), the defendant was successful in invoking the Rule of Provocation in a situation in which his ultimate victim had pounded the defendant's head several times into metal steps

along a sidewalk and was giving him a "beating" before the defendant angrily drew a revolver and shot his assailant.

## "... But Words Will Never Hurt Me"

Nothing in the circumstances of this case showed the appellant to have been the victim of a significant battery. The appellant at the Crown Station had suffered an insult, an insult to his manhood. The insult, however, was exclusively verbal. That is not a legally adequate provocation. In *Lang v. State*, 6 Md.App. 128, 250 A.2d 276 (1969), the victim had called the defendant a "chump" and a "chicken" and had dared him to fight. He shouted obscenities at the defendant, pointed his finger at him, and shook his fist at him. This Court held that the provocation was not legally sufficient:

> We hold ... that merely shouting epithets such as "chump" and "chicken," or shouting obscene words, or shaking finger or hand at the appellant, where there is no evidence of a present intention or ability to cause the appellant bodily harm will not constitute legally sufficient provocation for purposes of requiring an instruction on heat of passion.

6 Md.App. at 132, 250 A.2d 276. The Court of Appeals reached the same conclusion in *Sims v. State*, 319 Md. at 552, 573 A.2d 1317.

> *Insulting words or gestures, no matter how opprobrious, do not amount to an affray, and standing alone, do not constitute adequate provocation.* Although there was evidence from which the jury could have found that Bucino had directed racial and derogatory comments toward Sims in the bar, this conduct did not constitute adequate provocation.

(Emphasis supplied).

In terms of provocative insults, it would be hard to surpass the taunting words uttered by a wife as she ridiculed her husband for his manifold inadequacies in *Girouard v. State*, 321 Md. at 540, 583 A.2d 718. Indicative of the general tenor of the sustained and continuing taunting were such observations as, "I never did want to marry you and you are a lousy fuck and you remind me of my dad." The Court of Appeals

held, "Although there are few Maryland cases discussing the issue at bar, those that do hold that words alone are not adequate provocation." The Court's conclusion, 321 Md. at 542, 583 A.2d 718, underscored the principle that, no matter how provocative an essentially verbal confrontation may be in psychological fact and even if it is compounded by some physical contact not amounting to a significant battery, society cannot permit the passions to be unbridled.

> We cannot in good conscience countenance holding that a verbal domestic argument ending in the death of one spouse can result in a conviction of manslaughter. We agree with the trial judge that social necessity dictates our holding. Domestic arguments easily escalate into furious fights. We perceive no reason for holding in favor of those who find the easiest way to end a domestic dispute is by killing the offending spouse.

The appellant here was obviously provoked, but he failed to establish any legally adequate provocation.

### Every Assault Is Not A Battery

Had the appellant attempted to establish that he shot Adams in hot-blooded rage triggered by Adams's having pulled a gun on him (he did not so attempt), that could present a touchier problem in terms of the legal adequacy of the provocation. The answer to such a hypothetical problem seems clear, but we would at least be writing on a clean slate.

All of the Maryland cases and all of the academic authorities listing the legally adequate provocations refer expressly to one of them as a "response to a significant battery." There is no mention of a "response to a significant assault." The crime of assault, of course, is a three-headed monster. It is a battery. It is also an attempted battery. It is finally the intentional placing of the victim in fear of an imminent battery.

When Adams pulled a gun on the appellant and smiled, that was an assault. It might even have qualified as a substantial assault. It was not, however, a battery. It was not, not yet at least, even an attempted battery. The Maryland cases—

*Dorsey v. State, supra,* and *McKay v. State, supra*—and the academic authorities—*Moreland, Perkins,* and *Clark and Marshall*—all speak of actual batteries. They describe the stunning effect of severe physical blows. Particularly because the historic trend has been toward tightly restricting the categories of legally adequate provocation rather than toward expanding them, we would not be inclined to add a new category(or even sub-category) to the list. In this case, moreover, the problem is only hypothetical.

## A Causal Connection

The last requirement for invoking the Rule of Provocation is that the appellant establish a causal connection between his hot-blooded rage and his use of deadly force. The appellant never said, "Adams insulted me, or 'disrespected me,' at the Crown Station, which caused me to fly into a violent rage and shoot him." He never said, "Adams pulled a gun on me and smiled, which caused me to fly into a violent rage and shoot him." It is not enough to show, objectively, circumstances from which the possibility of such reactions might be inferred. It was necessary for the defense to establish a prima facie case of such a causal connection in the appellant's subjective motivation. In this regard, it is the defense that must connect the dots. It did not do so in this case. Judge Bernhardt was not in error in refusing to instruct the jury on the Rule of Provocation.

## The Plague of Plain Error

The appellant asks us to hold that Judge Bernhardt erroneously failed, *sua sponte,* to instruct the jury that either or both of the mitigating doctrines of imperfect self-defense and hot-blooded response to legally adequate provocation might apply to the charge of first-degree assault. A request for such an instruction was never remotely suggested to Judge Bernhardt, however, and nothing in this regard has been preserved for appellate review.

The appellant invites us, in our discretion, to take notice of plain error. We decline to do so. We must note, in

passing, that the promiscuous invocation of the plain error exception to the preservation requirement is rapidly becoming a juridical nuisance. There is a place for the notice of plain error but it is for the truly extraordinary occasion. There should probably be such notice taken more often than the periodic appearances of Halley's Comet but not nearly so frequently as quadrennial presidential elections. In any event, this is not one of those rare occasions.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**